UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| THE STATE OF LOUISIANA, By and through its Attorney General, Elizabeth B. Murrill; and<br><br>THE STATE OF MISSISSIPPI, By and through its Attorney General, Lynn Fitch,<br><br>PLAINTIFFS,<br><br>v.<br><br>EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>DEFENDANT. | <br><br><br><br><br><br><br><br><br><br>CIVIL ACTION NO. _____ |

## COMPLAINT

Congress's intent in passing the Pregnant Workers Fairness Act of 2022, 42 U.S.C. § 2000gg-1, is embedded in the Act's name: to ensure that pregnant women receive reasonable and fair accommodations in the workplace that promote healthy pregnancies and protect the unborn. The final rule at issue here, however, turns the Act on its head. A recent Equal Employment Opportunity Commission (EEOC) rule requires employers to accommodate employees' *abortions*—the *terminations* of pregnancies—even in States like Louisiana and Mississippi where elective abortions of healthy pregnancies are generally illegal. *See* Ex. A, EEOC, *Implementation of Pregnant Workers Fairness Act*, 89 Fed. Reg. 29,096 (Apr. 19, 2024). The final rule defies the Act's text, as one of the Act's co-sponsors, Louisiana Senator Bill Cassidy, himself has made clear. And the final rule departs from the Supreme Court's recognition in *Dobbs v. Jackson Women's Health Org.,* 597 U.S. 215 (2022), that States have many legitimate interests in regulating abortion. Louisiana and Mississippi thus have no choice but to challenge EEOC's unlawful abortion-accommodation mandate.

1

## INTRODUCTION

1.      In Louisiana and Mississippi, more than half of eligible women participate in the labor force.[1] On any given day, thousands (if not millions) of American women will enter their workplace pregnant. What accommodations can they receive to ensure a healthy pregnancy? That is where the Pregnant Workers Fairness Act of 2022 (PWFA or the Act) comes in.

2.      The PWFA requires employers to accommodate "known limitations" arising from a worker's "pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg-1. One of the PWFA's co-sponsors, Senator Lisa Murkowski, emphasized that the PWFA would secure "basic, com-monsense accommodations [that pregnant women] need at work to ensure a healthy pregnancy and a healthy baby."[2] Similarly, another co-sponsor, Senator Cassidy, emphasized that "[w]e need to care for and enable all Americans"—and "[t]his is a double purpose for those pregnant," because "[t]hey con-tribute to our today and carry our future."[3]

3.      In passing the PWFA with bipartisan support, Congress directed EEOC to issue by December 2023 an implementing rule "provid[ing] examples of reasonable accommodations." 42 U.S.C. § 2000gg-3(a). EEOC responded by issuing a proposed rule in August 2023. *See* EEOC, *Regulations to Implement the Pregnant Workers Fairness Act*, 88 Fed. Reg. 54,714 (Aug. 11, 2023) (Proposed Rule). The Proposed Rule proposed to transform the Act's *pro*-pregnancy mandate into an *anti*-preg-nancy mandate. Specifically, the Proposed Rule claimed that the "pregnancy, childbirth, or related medical conditions" an employer must reasonably accommodate under the PWFA includes pregnant workers' *abortions* (potentially warranting abortion leave), whether or not the procedure is medically related—and even if such abortions are illegal under State law. *Id.* at 54,721. That claim is wrong for

---

[1] The Economics Daily, *Labor force participation rate for women highest in the District of Columbia in 2022*, U.S. Bureau of Labor Statistics (Mar. 7, 2023), https://tinyurl.com/byn6d5ka.
[2] Bob Casey, *Casey, Cassidy Introduce Bipartisan Pregnant Workers Fairness Act, Propose Protections Against Workplace Discrimination* (Apr. 29, 2021), https://tinyurl.com/4jz68pcb.
[3] *Id.*

many reasons, not least of which is that an abortion is a *procedure*, not a *condition*, and the PWFA requires reasonable accommodations only for *conditions* of pregnancy.

4.      EEOC's preposterous Proposed Rule unsurprisingly provoked a significant public backlash. Thousands of commenters opposed the proposed abortion-accommodation mandate.[4] Notably, among the objectors was Louisiana Senator Cassidy, who—having co-sponsored the PWFA based on its protection of both maternal and fetal life—sought to prevent unelected EEOC commissioners from turning the Act into a pro-abortion law. In particular, he accused EEOC of "substitut[ing] its views on abortion for those of Congress."[5] He also cited the remarks of his Democrat co-sponsor, Senator Bob Casey, who confirmed on the Senate floor that "under the [PWFA] . . . the EEOC, could not—*could not*—issue any regulation that requires abortion leave . . . [or] require employers to provide abortions in violation of State law."[6]

5.      Louisiana and Mississippi likewise objected. They co-signed with numerous other States a comment arguing that EEOC's proposed coverage of abortion violated the PWFA. *See* Ex. B, Comment Letter on Regulations to Implement the Pregnant Workers Fairness Act (Oct. 10, 2023) (States' Comment). They argued that abortions themselves are not "medical conditions" *arising from* pregnancy, but instead voluntary procedures that *terminate* pregnancy. And they pointed out that such pregnancy- and fetal-life-ending procedures are illegal (with narrow exceptions) in Louisiana, Mississippi, and other States.

6.      But EEOC refused to listen. A few days ago, the EEOC published its Final Rule, which mandates that employers—including States where abortion is generally prohibited—provide

---

[4] Comments on EEOC's Proposed Rule are available at https://www.regulations.gov/document/EEOC-2023-0004-0001/comment.
[5] Sen. Bill Cassidy, Comment Letter on Proposed Rule to Implement Pregnant Workers Fairness Act (Sept. 29, 2023), https://tinyurl.com/yc4rvwrt.
[6] *Id.*

abortion accommodations to their workers. *See* Ex. A, 89 Fed. Reg. 29,096 (Final Rule). As the Proposed Rule forecasted, EEOC's Final Rule requires the accommodation of *all* abortions. Even those performed to end a healthy pregnancy and terminate an unborn child's life. And even as to States that, with narrow exceptions, have made abortion illegal.

7.      In so doing, the Final Rule not only runs roughshod over the PWFA's text, but also runs afoul of *Dobbs.* There, the Supreme Court expressly recognized that the States have many legitimate interests in regulating abortion, including "respect for and preservation of prenatal life at all stages of development," *Dobbs,* 597 at 301. But the Final Rule contravenes *Dobbs* by requiring the Plaintiff States to accommodate the very type of abortions that they have chosen, in their sovereign capacities, to proscribe—or else face federal lawsuits for money damages and injunctive relief.

8.      The Final Rule is unlawful. Accordingly, Louisiana and Mississippi seek preliminary and permanent relief.  They ask the Court to postpone and stay the Final Rule's June 18, 2024, effective date pending judicial review, *see* 5 U.S.C. § 705, as well as enjoin EEOC's enforcement of the Rule's abortion-accommodation mandate against the States. And the States request that this Court declare unlawful, set aside and vacate, and permanently enjoin enforcement of the Final Rule's unlawful abortion-accommodation mandate.

## PARTIES

9.      Plaintiff State of Louisiana is a sovereign State of the United States of America and an employer subject to the Final Rule. Louisiana currently employs over 40,000 women in various capacities across the State.[7] Elizabeth B. Murrill is the Attorney General of the State of Louisiana. She is authorized by Louisiana law to sue on the State's behalf. La. Const. art. IV, § 8. Her offices are located at 1885 North Third Street, Baton Rouge, Louisiana 70802.

---

[7] *State Civil Service Annual Report Fiscal Year 2022-2023* at 9, https://tinyurl.com/arj6be3p.

10.     The Louisiana Constitution expressly provides that, "[t]o protect human life, nothing in this constitution shall be construed to secure or protect a right to abortion or require the funding of abortion." La. Const. art. I, § 20.1. In addition, under Louisiana law, "[n]o person may knowingly use or employ any instrument or procedure upon a pregnant woman with the specific intent of causing or abetting the termination of the life of an unborn human being." La. R.S. § 40:1061(C). Similarly, Louisiana law makes it "unlawful for a physician or other person to perform an abortion, with or without the consent of the pregnant female." *Id.* § 14:87.7(A); *see also id.* § 14:87.8(A), (B) (establishing penalties up to 15 years' imprisonment and $200,000 in fines). At the same time, Louisiana law provides an exception "for a licensed physician to perform a medical procedure necessary in reasonable medical judgment to prevent the death or substantial risk of death due to a physical condition, or to prevent the serious, permanent impairment of a life-sustaining organ of a pregnant woman." *Id.* § 40:1061(F). Louisiana currently does not provide workplace accommodations to allow employees to seek elective abortions, the provision of which is a crime under Louisiana law.

11.     Plaintiff State of Mississippi is a sovereign State of the United States of America. Mississippi currently employs over 14,800 women in various capacities across the State.[8] Lynn Fitch is the Attorney General of the State of Mississippi. She is authorized by Mississippi law to sue on the State's behalf. Miss. Const. art. VI, § 173; Miss. Code Ann. § 7-5-1; *see Gandy v. Reserve Life Ins. Co.*, 279 So. 2d 648, 649 (Miss. 1973). Her offices are located at 550 High Street, Suite 1200, Jackson, Mississippi 39201.

12.     Under Mississippi law, "[n]o abortion shall be performed or induced in the State of Mississippi, except in the case where necessary for the preservation of the mother's life or where the pregnancy was caused by rape." Miss. Code Ann. § 41-41-45(2); *see id.* § 41-41-45(1) (defining "abor-

---

[8] *Mississippi State Personnel Board Annual Report Fiscal Year 2023* at 16, 19, https://tinyurl.com/yanztpdc.

tion"). In addition, "[a]ny person, except the pregnant woman, who purposefully, knowingly, or reck-lessly performs or attempts to perform or induce an abortion in the State of Mississippi, except in the case where necessary for the preservation of the mother's life or where the pregnancy was caused by rape, upon conviction, shall be punished by imprisonment in the custody of the [Mississippi] Depart-ment of Corrections for not less than one (1) year nor more than ten (10) years." *Id.* § 41-41-45(4). Mississippi currently does not provide workplace accommodations to allow employees to seek elective abortions, the provision of which is a crime under Mississippi law.

13.     Defendant EEOC is a federal agency charged with promulgating regulations under the PWFA, *see* 42 U.S.C. § 2000gg-3(a), and with enforcing the PWFA and related agency guidelines and rules, *id.* § 2000gg-2. EEOC also may issue "right-to-sue" letters that allow private individuals to sue their employers for violating the PWFA or EEOC's final PWFA rule. *See id.* § 2000e-5(b), f(1). EEOC is an agency subject to the Administrative Procedure Act. *See*, *e.g.*, *Texas v. EEOC*, 933 F.3d 433, 437 (5th Cir. 2019).

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction over this case because it arises under the laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 701-06. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declar-atory relief, injunctive relief, and other relief under 28 U.S.C. §§ 2201-02, 5 U.S.C. §§ 705-06, and its inherent equitable powers.

15.     The Final Rule is a final agency action that is judicially reviewable under the Adminis-trative Procedure Act. 5 U.S.C. §§ 704, 706.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because the State of Loui-siana is a resident of this judicial district (and no real property is involved). In addition, the Final Rule affects Louisiana's employment operations throughout the State.

## BACKGROUND

I.      **Lawmakers Pass the PWFA to Promote Safe Employee Pregnancies**

17.    Over the years, members of Congress have sought to create federally required work-place accommodations for pregnant female employees. Those efforts culminated in 2021 and 2022, when the House and Senate advanced bipartisan legislation that would later be enacted as the PWFA. In broad terms, the PWFA requires employers to accommodate limitations related to a worker's pregnancy, childbirth, or related medical conditions. Through the PWFA, Congress tasked EEOC with adopting regulations "providing examples" of reasonable accommodations to help implement the statute. Pregnant Workers Fairness Act of 2021, H.R. 1065, 117th Cong. § 4 (2021); Pregnant Workers Fairness Act of 2021, S. 1486, 117th Cong. § 4 (2021).

18.    Throughout debate on the PWFA, lawmakers agreed that the PWFA's purpose was to accommodate pregnant workers and ensure healthy pregnancies and childbirth. On the Senate side, after the PWFA's advancement from the Senate Health, Education, Labor, and Pensions Committee, Committee Chair Patty Murray stated that "[n]o one should be forced to decide between a healthy pregnancy and staying on the job—so we must pass the [PWFA] without delay."[9] Similarly, PWFA co-sponsor Lisa Murkowski expressed her support for the bill's "commonsense accommodations . . . to ensure a healthy pregnancy and a healthy baby."[10] Sponsoring lawmakers in the House likewise emphasized that the PWFA would help ensure that women would not need to sacrifice continued employment for safe pregnancies. *See, e.g.*, 167 Cong. Rec. H2346 (daily ed. May 14, 2021) (statement of Rep. Carolyn Maloney) ("No pregnant worker should have to choose between their and their baby's health or their job.").

---

[9] *Senate HELP Committee Advances Bipartisan Bills to Improve Suicide Prevention, Protect Pregnant Workers, and Support People with Disabilities*, S. Comm. on Health, Educ., Labor, & Pensions (Aug. 3, 2021), https://tinyurl.com/9dv9vax5.
[10] Bob Casey, *Casey, Cassidy Introduce Bipartisan Pregnant Workers Fairness Act, Propose Protections Against Workplace Discrimination* (Apr. 29, 2021), https://tinyurl.com/4jz68pcb.

19.     It was widely understood that the accommodations required under the PWFA—like providing a stool, or a water bottle, or additional bathroom breaks—would take little or no effort or expense by covered employers. *See*, *e.g.*, 168 Cong. Rec. S10081 (daily ed. Dec. 22, 2022) (statement of Sen. Bob Casey); 168 Cong. Rec. E1360 (Dec. 27, 2022) (statement of Rep. Suzanne Bonamici during extension of remarks). As Senator Murray put it, the PWFA's purpose was "to provide basic, common sense, low cost, and even no cost accommodations"—in fact, she could not "think of anything less controversial."[11]

20.     In December 2022, the House and Senate passed, and President Biden signed, the PWFA as part of the year-end consolidated appropriations package. *See* Consolidated Appropriations Act, 2023, div. II, Pub. L. 117-328 (2022), 136 Stat. at 6084.

21.     As enacted, the PWFA requires employers to accommodate any "known limitation[s] . . . related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg-1. The PWFA then defines "known limitation" as a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." *Id.* § 2000gg(4).

22.     The PWFA makes it unlawful for "covered" employers to discriminate against an employee with a "known limitation." Such discrimination includes: (1) refusing to provide reasonable accommodations; (2) forcing an employee to accept an accommodation that is not reasonable; (3) denying employment opportunities because of the employee's need for a reasonable accommodation; (4) forcing an employee to take paid or unpaid leave rather than providing a reasonable accommodation; or (5) taking an adverse employment action against an employee because the employee requested a reasonable accommodation. *Id.* § 2000gg-1.

---

[11] *Republican Senator Blocks Murray-Casey-Cassidy Effort to Pass Pregnant Workers Fairness Act*, S. Comm. on Health, Educ., Labor, & Pensions (Dec. 8, 2022), https://tinyurl.com/ywryjhru.

23.     The PWFA's text thus reinforces with what the drafting history suggests: The law is intended to protect pregnant workers and their babies by directing that women receive workplace accommodations for "pregnancy, childbirth, or related medical conditions." *Id.* § 2000gg(4).

24.     The PWFA received broad support from a wide range of organizations—including unlikely bedfellows: Planned Parenthood, NARAL, and the ACLU, as well as the pro-life U.S. Conference of Catholic Bishops and March of Dimes. *See* 168 Cong. Rec. S10081 (daily ed. Dec. 22, 2022) (statement of Sen. Bob Casey).

25.     Those unique alliances confirm the obvious point relevant here: No one thought the PWFA was intended to accommodate abortions. Senator Bob Casey, who sponsored the bill, expressly rejected the idea: "[U]nder the Pregnant Workers Fairness Act, the [EEOC] could not—could not—issue any regulation that requires abortion leave, nor does the act permit the EEOC to require employers to provide abortions in violation of State law." 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022). Senator Steve Daines agreed: "Senator Casey's statement reflects the intent of Congress in advancing the [PWFA] today. This legislation should not be misconstrued by EEOC or Federal courts to impose abortion-related mandates on employers, or otherwise to promote abortions, contrary to the intent of Congress." 168 Cong. Rec. S10081 (daily ed. Dec. 22, 2022). Senator Cassidy likewise "reject[ed] the characterization that [the PWFA] would do anything to promote abortion." 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022). And on the House side, proponents consistently billed the PWFA as giving "pregnant workers basic accommodations like an extra bathroom break and stool to sit on," 168 Cong. Rec. E1360 (Dec. 27, 2022) (statement of Rep. Suzanne Bonamici during extension of remarks), not forcing employers to accommodate employee abortions.

26.     And indeed, that is reinforced by one of the debates over the PWFA's impact on religious exercise. In particular, some lawmakers questioned the absence of a carve-out (similar to Title

VII's carve-out) for religion. *See, e.g.*, 166 Cong. Rec. H4512, H4515 (daily ed. Sept. 17, 2020) (statement of Rep. Virginia Foxx); 167 Cong. Rec. H2227 (daily ed. May 12, 2021) (statement of Rep. Guy Reschenthaler). In response, however, the chief sponsors questioned how the law's accommodation requirement could implicate religious practice. *See, e.g., H.R. 2547—Comprehensive Debt Collection Improvement Act; H.R. 1065—Pregnant Workers Fairness Act: Hearing before the House Rules Comm.*, 117th Cong. (2021), at 1:12:40-1:13:13 (statement of Rep. Jim McGovern, Committee Chair). Significantly, that question makes sense only if, in fact, the PWFA does not cover abortion accommodations, which undeniably raise a host of religious-exercise problems.

## II.    EEOC Proposes a PWFA Rule That Would Require Employers to Accommodate Workers' Elective Abortions—and Public Backlash Ensues.

27.    Despite this clear legislative history, EEOC subsequently wielded its rulemaking authority to propose a rule that would require covered employers—including States—to accommodate elective abortions. 88 Fed. Reg. 54,714 (Aug. 11, 2023) (Proposed Rule).

28.    The Proposed Rule was atextual and *ultra vires*, but its flawed conclusion was very clear: "[H]aving . . . an abortion" constitutes an "example[] of pregnancy, childbirth, or related medical condition[]" and is thus a reasonable accommodation required under the PWFA 88 Fed. Reg. at 54,774.

29.    The Proposed Rule was slated to have serious consequences for hundreds of thousands of public and private employers, including States, and for millions of employees. *Id.* at 54,719 (the PWFA and the Proposed Rule apply to "covered entities," which include public or private employers with fifteen or more employees, unions, employment agencies, and the Federal Government). The Proposed Rule proposed to require employers to support and devote resources to facilitating their employees' decisions to terminate fetal life, including by providing extra leave time. *Id.* at 54,730.

30.    Given the PWFA's expansive coverage, EEOC had to acknowledge that the Proposed Rule would have significant impacts on employers. *Id.* at 54,759. But EEOC catastrophically failed to

conduct a good faith impact analysis. For example, EEOC failed to seriously consider the costs of accommodating abortions, especially in States like Louisiana and Mississippi that restrict abortion with narrow exceptions. EEOC also failed to seriously consider Free Speech and Free Exercise problems presented by the Proposed Rule. *See id.* at 54,746–47. In the same constitutional vein, EEOC remarkably insisted that the Proposed Rule—which purports to waive State sovereign immunity—has no "federalism implications." *Id.* at 54,765. That is obviously wrong for many reasons (*e.g.*, EEOC is forcing States like Louisiana and Mississippi to go against State law and effectively facilitate abortion), but it was also a known problem to EEOC. In 2021, the Department of Justice warned that the purported waiver of state sovereign immunity presented "constitutional concerns" and "substantial litigation risk" because "Congress's authority to abrogate state sovereign immunity is limited" under Section 5 of the Fourteenth Amendment. Ex. C, Ltr. From U.S. Dep't of Justice, Office of Leg. Affairs, to The Hon. Robert C. Scott, Chairman, Cmte. On Educ. & Labor 1 (May 3, 2021) (DOJ Section 5 Letter).

31.     Unsurprisingly, the Proposed Rule's inclusion of abortion accommodations generated opposition in tens of thousands of comments. 89 Fed. Reg. at 29,104. Louisiana and Mississippi were among those opposing the Proposed Rule. *See generally* Ex. B, States' Comment.

32.     For example, the States' Comment generally argued that the Proposed Rule lacked statutory authority, violated the U.S. Constitution, and was arbitrary and capricious in violation of the APA. The States' Comment explained that the PWFA's text, structure, purpose, and drafting history made clear that the statute does not authorize EEOC to require employers to accommodate employee abortions. *Id.* at 2–4. Nor could EEOC's interpretation overcome the major-questions doctrine and constitutional-avoidance principles. *Id.* at 5. The States also highlighted constitutional barriers to EEOC's interpretation, including federalism problems, First Amendment problems, and constitutional defects in EEOC's structure itself. *Id.* at 6–8. In addition, they explained that the Proposed Rule

would flunk arbitration-and-capricious review, given EEOC's failure to (a) seriously confront the problems with forcing pro-life States that have generally prohibited abortion to affirmatively accommodate it and (b) consider costs associated with implementing the abortion-accommodation mandate. *Id.* at 8–9.

33.      Members of Congress likewise joined the public outcry. The PWFA's lead Republican co-sponsor in the Senate, Senator Bill Cassidy of Louisiana, highlighted the pre-passage agreement of his Democrat co-sponsor, Bob Casey, that "under the act, . . . the EEOC, could not—could not— issue any regulation that requires abortion leave" or "require employers to provide abortions in violation of State law."[12] By acting otherwise, Senator Cassidy argued, EEOC had "ignored the statute and substituted its views on abortion for those of Congress."[13] Similarly, the U.S. House of Representatives' Committee on Education and the Workforce commented that the "PWFA [d]oes [n]ot [a]pply to [a]bortions" and rebuked EEOC for "issu[ing] regulations contrary to the statute itself."[14] And in the same vein, Senator Mike Braun rejected EEOC's proposed extension of its abortion-accommodation mandate to States, noting that the Supreme Court in *Dobbs* "reserve[d] to the States the ability" to regulate abortion.[15]

## III.    EEOC Stubbornly Issues Its Abortion-Accommodation Mandate.

34.      But all the public outcry did not dissuade EEOC from pursuing and issuing its abortion-accommodate mandate. It did so by a one-vote margin (3-2) on April 19, 2024. *See* Ex. A, EEOC, *Implementation of Pregnant Workers Fairness Act*, 89 Fed. Reg. 29,096 (Apr. 19, 2024). And it did so by redefining the word "condition" (which employers must reasonably accommodate under the PWFA)

---

[12] Comment at 2 (Sept. 29, 2023) (quoting 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022)), https://perma.cc/L4F8-K2K6.
[13] *Id.* at 1.
[14] The Hon. Virginia Foxx, Comment at 1–2 (Oct. 10, 2023), https://tinyurl.com/5evp62d5.
[15] The Hon. Mike Braun, Comment (Oct. 10, 2023), https://tinyurl.com/4pfupzfh.

to include what is unquestionably a procedure—abortion. *Id.* at 29,104 (discussing "inclusion of abortion in the definition of 'pregnancy, childbirth, or related medical conditions'" (capitalization altered)).

35.    There is no serious dispute that EEOC is making up things as it goes. In fact, the Final Rule all but admits that the PWFA is silent on abortion. *See id.* at 29,111. But that did not prevent EEOC from smuggling abortion into the PWFA.

36.    Citing the statutory text highlighted above, EEOC's line of reasoning is as follows. The PWFA requires employers to "make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee." 42 U.S.C. § 2000gg-1(1). The PWFA defines "known limitation" as a "physical or mental *condition* related to, affected by, or arising out of pregnancy, childbirth, or related medical *conditions*." *Id.* § 2000gg(4) (emphases added). According to the Final Rule, "related medical conditions" are "medical conditions that relate to pregnancy or childbirth." 89 Fed. Reg. 29,191. So far, so good. But then the Final Rule quickly says that "[t]here are some medical conditions where the relation to pregnancy will be readily apparent"—including "having or choosing not to have an abortion." *Id.* But abortion is not a "condition." And that is where the abortion-accommodation mandate runs aground.

37.    The Final Rule notes that some courts have interpreted anti-discrimination language in Title VII to bar employers from taking adverse actions against employees because they "contemplated having, or chose to have, an abortion." *Id.* at 29,110, 29,152 n.296. EEOC likewise has issued informal guidance along those lines. *E.g.*, *id.* at 29,152 n.296. And given this backdrop, EEOC remarkably claims that its past interpretation of Title VII is "settled," and thus, Congress must have intended to carry it forward in the PWFA. *Id.* at 29,106; *accord id.* at 29,191 n.23.

38.    That prior-construction argument is specious. Title VII's language is different than the PWFA's, including because Title VII lacks the key term "medical condition." 42 U.S.C. § 2000e(k). That dooms this argument because, as EEOC's own cited case notes, the prior-construction canon is

relevant (if at all) only where Congress uses "repetition of the same language in a new statute." *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) (cited at 89 Fed. Reg. 29,191 n.23). And as for EEOC's spurious attempt to rely on its own past informal guidance, this case is nothing like *Bragdon*, where the Supreme Court emphasized that "[a]ll indications are that Congress was well aware of the position taken by [the Department of Justice's Office of Legal Counsel] when enacting the [Americans with Disabilities Act] and intended to give that position its active endorsement." *Id.* (citing House and Senate reports). Here, EEOC does not cite any support, textual or otherwise, for its view that Congress was aware of and intended to implement EEOC's view about the prior meaning of *different* language in a *different* statute to mandate abortion accommodations in the PWFA. Quite the contrary: EEOC acknowledges that multiple sponsors of the bill insisted the PWFA would *not* require abortion accommodations. 89 Fed. Reg. at 29,109.

39.     The Final Rule's struggle to find a foothold in the statutory text for the abortion-accommodation mandate is just one of many problems. Another such problem is the Rule's demolition of basic federalism and state-sovereignty principles, particularly where a State's laws generally prohibit abortion but the State is nonetheless mandated (under the Final Rule) to accommodate abortions. On this subject, any credibility the Rule had to begin with is easily destroyed by EEOC's representation that the Final Rule "does not have 'federalism implications.'" *Id.* at 29,182. Even EEOC does not believe that misrepresentation because it earlier demurred, insisting that any "interaction or conflict between PWFA and State laws . . . will be addressed on a case-by-case basis." *Id.* at 29,112. And EEOC gave the same treatment to Free Speech and Free Exercise issues arising from forcing employers and employees to effectively endorse views on abortion with which they vehemently disagree. EEOC's answer: Such defenses may be addressed "using a case-by-case analysis." *Id.* at 29,144, 29,148, 29,151, 29,220 n.206.

40.     The Final Rule also commits basic errors that even first-year law students could iden-tify. For example, the Rule claims to identify the mandate's costs, but the Rule did not account for *any* additional expenses that will be incurred in States like Louisiana, which have existing "PWFA-type statutes." *Id.* at 29,159. EEOC simply assumed that the Final Rule would impose *no added costs* on employers in those States. *Id.* at 29,173-74 tbls.3-4. But EEOC never identified an evidentiary basis for that one-to-one assumption. And as a matter of common sense, that assumption is especially wrong as to States like Louisiana, which *prohibit* abortion with narrow exceptions in the first place—of course, employers in those jurisdictions do not currently operate under an abortion-accommoda-tion mandate and thus will be forced to incur costs to comply with the Rule's mandate.

41.     This basic math error led EEOC to exclude any costs associated with its expansive PWFA mandate as applied to 11.5 million State and local governmental employees (61% of State and local governmental employees in total) and 61.2 million private sector employees (52% of covered private sector employees in total). *Id.* at 29,173-74 tbls.3-4. The result undercounts the Final Rule's coverage costs by many millions. *Id.* And in assessing compliance and implementation costs, the Final Rule presumes that human resource officers in States with "PWFA-type statutes" will need less than an hour to understand the 125-page Final Rule's novel federal requirements. *Id.* at 29,176 tbl.9. The Final Rule further presumes that covered entities will not "need legal advice," *id.* at 29,160, even while acknowledging throughout that the Rule's application could raise particular factual, constitutional, and state-law concerns that will require analysis on a "case-by-case" basis. *E.g.*, *id.* at 29,112. Even so, the Final Rule predicts that covered employers will incur total one-time administrative costs of over $450 million. *Id.* at 29,176 tbl.9.

42.     Finally, on sovereign immunity, EEOC did not address comments questioning its con-stitutional power to subject States to money damages and other remedies for failing to accommodate elective abortions. *Id.* at 29,113. Instead, the Final Rule states only that "Congress did not vote to

remove the section of the PWFA that waives State sovereign immunity." *Id.* EEOC's Final Rule confirms that States "will not be immune under the 11th Amendment to actions brought under the PWFA" and will be liable "both at law and in equity" to "the same extent [as] any other public or private entity." *Id.* at 29,182.

43.     EEOC's Final Rule has a 60-day effective date, meaning it will take effect on June 18, 2024. *Id.* at 29,096.

44.     EEOC Commissioner Andrea R. Lucas dissented and issued a statement faulting the Commission majority's "controversial" and "misguided" decision and use of "linguistic gymnastics" to "broaden the scope of the [PWFA] in ways that . . . cannot reasonably be reconciled with the text." Ex. D, Andrea R. Lucas, Comm'r, Equal Emp't Opportunity Comm'n, Statement re: Vote on Final Rule to Implement the Pregnant Workers Fairness Act (Apr. 15, 2024), at 1, 16.

45.     The majority's principal error was "skipping straight to" selected "interpretive canons instead of first resolving whether any textual ambiguity exists." *Id.* at 5. Commissioner Lucas emphasized that the "ordinary meaning" of the term "condition" is a "state of health" or "malady or sickness," so the PWFA requires only "accommodation of medical conditions—states of health or illness—that are created or aggravated by pregnancy and childbirth." *Id.* at 10–11. "[C]ontrary to the final rule's definition, a medical 'condition' is not the same as medical 'procedures.'" *Id.* at 11. Commissioner Lucas thus disagreed with the Final Rule's interpretation of the term "medical *condition*" to include "specific treatments, medications, or medical procedures," and EEOC's broader "attempt[] to transform the PWFA into an omnibus female reproduction disability statute." *Id.* at 11 n.11. And on her view, abortion—a procedure—plainly is not a condition that an employer must reasonably accommodate.

46.     Separately, Commissioner Lucas rejected EEOC's "misleading[]" characterization of the prior regulatory and judicial interpretations of the phrase "pregnancy, childbirth, or related medical

conditions." *Id.* at 4, 16. EEOC marshaled only "thin support" for its interpretation, which Commissioner Lucas reasoned was "not sufficient to show a 'settled consensus' such that Congress should be presumed to have known of and endorsed it." *Id.* at 6.

47.     Members of Congress likewise objected to the Final Rule's coverage of abortion accommodations. Rep. Virginia Foxx stated that "[a]dding this controversial provision into the PWFA is wrong. Period. Abortion is not a medical condition related to pregnancy; it is the opposite."[16] For his part, Louisiana Senator Bill Cassidy—a doctor himself—criticized the Final Rule's decision to "inject abortion into a law specifically aimed at promoting healthy childbirth" as "shocking and illegal."[17]

## IV.     Plaintiffs Stand to Suffer Immediate Irreparable Harm.

48.     Because thousands of women work as state employees in Louisiana and Mississippi, the States regularly have pregnant employees. And while those pregnant workers receive various types of accommodations (such as parental leave and sick leave), the States do not offer accommodations for state employees to pursue elective abortions prohibited by state law. Compelling employers like Louisiana and Mississippi to provide such accommodations under the Final Rule would thus cause immediate and irreparable harm to the States.

49.     One primary example is on-the-ground costs, from compliance itself to the loss of employee productivity. As for compliance, the States will incur human resources and other compliance costs related to facilitating these accommodations, informing employees about benefits, and updating employee materials to reflect the accommodation for abortions. In complying with the abortion-accommodation mandate, moreover, the States will suffer various losses when employees take advantage of such accommodations—the productivity lost by the employee's absence, the complications arising from the States' attempts to fill the employee's gap in employment, and so on. And even if any of

---

[16] Breccan F. Thies, *Biden Administration Finalizes Pregnant Workers' Rule with Abortion 'Political Agenda'*, Wash. Examiner (Apr. 15, 2024), https://tinyurl.com/3ar8pf3y.

[17] *Id.*

these costs would ordinarily be redressable in the form of money damages, EEOC will assert sovereign immunity, rendering such damages unrecoverable and thus "irreparable" harm. *See, e.g., Wages & White Lion Invs., LLC. v. FDA,* 16 F.4th 1130, 1142 (5th Cir. 2021).

50.     More fundamentally, the Final Rule's abortion-accommodation mandate directly infringes the States' sovereignty. The citizens of Louisiana and Mississippi, through their respective elected representatives, have generally prohibited abortion with narrow exceptions. *See supra* ¶¶ 10, 12. And they have the right to do so. As the Supreme Court emphasized in *Dobbs* (which arose in Mississippi), States may regulate abortion to further their legitimate interests, including:

> respect for and preservation of prenatal life at all stages of development; the protection of maternal health and safety; the elimination of particularly gruesome or barbaric medical procedures; the preservation of the integrity of the medical profession; the mitigation of fetal pain; and the prevention of discrimination on the basis of race, sex, or disability.

*Dobbs,* 597 U.S. at 301.

51.     But the Final Rule seeks to undercut *Dobbs*. Under the Final Rule, the federal government purports to use the administrative state to coerce States to facilitate abortions—even though such coercion forces States like Louisiana and Mississippi to violate their policies of regulating abortion to protect unborn life and the interests above. That, too, is textbook irreparable harm. *See Abbott v. Perez,* 585 U.S. 579, 602 n.17 (2018) ("[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State[.]" (citing *Maryland v. King,* 567 U.S. 1301 (2012) (Roberts, C.J., in chambers))).

52.     Finally, and relatedly, by requiring the States to adopt policies facilitating abortions, the Final Rule unconstitutionally impinges upon the States' own right to speak and choose its own messaging. On the issue of abortion and the importance of protecting the unborn, Louisiana and Mississippi have chosen a simple message: Abortion is prohibited with narrow exceptions. But the federal government seeks to alter that message by forcing the States to nonetheless accommodate

abortions that are contrary to, and directly undermine, the States' message. Again, that is irreparable harm. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (*NIFLA*) ("By requiring petitioners to inform women how they can obtain state-subsidized abortions—at the same time petitioners try to dissuade women from choosing that option—the licensed notice plainly 'alters the content' of petitioners' speech."); *cf. Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 216 (2015) ("With respect to specialty license plate designs, Texas is not simply managing government property, but instead is engaging in expressive conduct.").

## CLAIMS FOR RELIEF

### COUNT I
### Violation of APA, 5 U.S.C. § 706(2)(A), (C)
### Pregnant Workers Fairness Act

53.     Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

54.     The Final Rule is a final agency action within the meaning of 5 U.S.C. § 704, Plaintiffs have no other adequate remedy to challenge the Final Rule in court, and no rule requires that Plaintiffs appeal to a superior agency authority prior to seeking judicial review.

55.     The APA requires courts to set aside agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Here, the Final Rule directly contravenes the Pregnant Workers Fairness Act in numerous respects.

56.     The Rule's flaws are principally apparent based on a close examination of the PWFA's text. As noted above, the PWFA requires employers to accommodate any "known limitation[s]," 42 U.S.C. § 2000gg-1, which is statutorily defined as a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions," *id.* § 2000gg(4). But elective abortion of a healthy pregnancy is neither a known limitation nor a condition related to pregnancy; it

is a procedure intended to *terminate* a pregnancy. Treating abortion as a condition *of* pregnancy thus squarely contravenes the statutory text and ordinary English language. And that is not surprising given that, prior to the EEOC's Proposed Rule, no one—especially the PWFA's co-sponsors—understood the PWFA to mandate reasonable accommodations for abortion.

57.     A host of other doctrines reinforce that the Final Rule is invalid. Take, for example, the major-questions doctrine, which generally requires "clear congressional authorization" before an agency may decide an issue of great "economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 721, 723 (2022). That doctrine dooms the Final Rule: Abortion regulations "concern matters of great social significance and moral substance," *Dobbs*, 597 U.S. at 300—yet Congress plainly did not authorize an abortion-accommodation mandate in the PWFA. Consider also basic federalism and constitutional-avoidance principles. The Supreme Court's "precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (per curiam) (citation and quotation marks omitted). And the Supreme Court has long emphasized that, "when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). Again, Congress did not speak clearly (or at all) on abortion in the PWFA, and construing the PWFA to authorize the Final Rule's abortion-accommodation mandate would raise a number of constitutional problems that counsel against EEOC's reading, *see infra* Count II.

58.     To the extent EEOC tries to claim deference to its interpretation *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), that attempt is futile. For one, EEOC does not identify any statutory ambiguity that could trigger *Chevron*. For another, at Step One, constitutional avoidance and other tools of statutory interpretation would readily resolve any ambiguity against the

EEOC's interpretation for all the reasons just mentioned. And for yet another, at Step Two, EEOC could not plausibly argue that its abortion-is-a-condition interpretation is reasonable. *See City of Arlington v. F.C.C.*, 569 U.S. 290, 296 (2013) (noting that agency construction must be "within the bounds of reasonable interpretation"). And finally, even if EEOC could survive all these obstacles, *Chevron* itself should be reconsidered and rejected. *Cf. Loper Bright Enters. v. Raimondo* (U.S. No. 22-451) (cert. granted May 1, 2023).

59.     The Final Rule's abortion-accommodation mandate exceeds EEOC's statutory authority and is invalid under the APA. It should be enjoined and "set aside." 5 U.S.C. § 706(2).

## COUNT II
### Violation of U.S. Constitution and 5 U.S.C. § 706(2)(B)
### State Sovereignty, Fourteenth Amendment, Federalism, and First Amendment

60.     Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

61.     Wholly apart from its statutory illegality, the Final Rule's abortion-accommodation mandate is "contrary to constitutional right [or] power," 5 U.S.C. § 706(2)(B), in several respects.

62.     For one thing, it ignores at least two Fourteenth Amendment limits on federal power. One is that Congress's Section 5 power to abrogate sovereign immunity "extends *only* to 'enforc[ing]' the provisions of the Fourteenth Amendment." *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997). Given that limit, DOJ warned lawmakers that the PWFA's abrogation of state sovereign immunity presented "significant litigation risk" because pregnancy discrimination is not sex discrimination *per se*. *See* Ex. C, DOJ Section 5 Letter, at 1–2. And that risk is, in fact, fatal because no provision of the Constitution confers heightened protection of abortion rights. *See Dobbs*, 597 U.S. at 292; *Geduldig v. Aiello*, 417 U.S. 484, 494 (1974). The second is that, "in order to authorize private individuals to recover money damages against the States, there must be a pattern of discrimination by the States which violates the Fourteenth Amendment, and the remedy imposed by Congress must be congruent

and proportional to the target violation." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001). Here, however, Congress certainly did not identify a problematic pattern of unconstitutional violations regarding abortion that the PWFA was intended to remedy—and thus, the "remedy" the Final Rule proposes is certainly not congruent and proportional.

63.     There also are massive federalism problems under the Final Rule's reimagining of the PWFA. Basic federalism precepts dictate that the federal government "may not conscript state governments as its agents," *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 472 (2018), including by "dictat[ing] what a state legislature may and may not do," *id.* at 474. And although Congress may regulate the States as employers, it cannot do so in a way "that is destructive of state sovereignty." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 554 (1985). Yet EEOC's Final Rule does just that by forcing States to accommodate, and effectively endorse, abortions that are illegal under State law.

64.     The Final Rule's damage also extends to the First Amendment. It principally requires employers to accommodate elective abortions contrary to state law (even if that conflicts with an employer's viewpoints or deeply held religious beliefs). Similarly, it requires employers to, in turn, require their employees themselves to speak and otherwise effectively endorse abortion by facilitating it (even if that conflicts with an employee's viewpoints or deeply held religious beliefs). *Cf. 303 Creative LLC v. Elenis*, 600 U.S. 570, 596 (2023) ("No government . . . may affect a speaker's message by forcing her to accommodate other views." (cleaned up)). And rather than confront these First Amendment problems head on, EEOC assured employers that it would "evaluate each [constitutional] claim on a case-by-case basis." 89 Fed. Reg. 29,153. That is empty comfort for untold thousands, and perhaps millions, of employers and employees who will immediately experience a chilling effect on their First Amendment rights if the Final Rule takes effect.

65.     Plaintiffs thus seek an order declaring that the PWFA cannot constitutionally be read to permit the abortion accommodations required by the Final Rule, as well as an order enjoining and setting aside the abortion-accommodation mandate and any related provisions that impinge on constitutional rights.

## COUNT III
### Violation of APA, 5 U.S.C. § 706(2)(A)
### The Final Rule Is Arbitrary and Capricious

66.     Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

67.     Agency actions are arbitrary and capricious when they "entirely fail to consider an important aspect of the problem or offer an explanation for [the agency's] decision that runs counter to the evidence before it." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020) (cleaned up) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). That describes the Final Rule here.

68.     First and foremost, the Rule bungles the federalism problems raised by the abortion-accommodation mandate. The Rule toggles between outright denial (by asserting that the Final Rule "does not have 'federalism implications,'" 89 Fed. Reg. at 29,182) and blatant punting (by asserting that "action taken by an employer pursuant to the PWFA could potentially implicate State law," and that such conflicts "will be addressed on a case-by-case basis," *id.* at 29,113. EEOC's inability to speak consistently illustrates that EEOC failed to actually address the federalism concerns associated with forcing States to accommodate and effectively fund abortions, including those that are illegal under state law. And EEOC's preference for case-by-case adjudications of a State's "legitimate interests" in regulating abortion invites courts to "'substitute their social and economic beliefs for the judgment of legislative bodies.'" *Dobbs*, 597 U.S. at 300, 301 (quoting *Ferguson v. Skrupa*, 372 U.S. 726, 730 (1963)).

69.     EEOC likewise fails to meaningfully assess the Free Speech, Free Exercise, and Religious Freedom Restoration Act implications of the Final Rule. Here too, EEOC tries to kick the can down the road by asking for resolution later on a "case-by-case basis." And again, EEOC talks out of both sides of its mouth by both disputing whether the Final Rule implicates speech at all, 89 Fed. Reg. at 29,152, and suggesting that a workplace statement about an employee's requested accommodation could give rise to liability for "harass[ment]," *id.* at 29,148 & 29,218. If an agency cannot make up even its own mind, its rule necessarily is arbitrary and capricious.

70.     Finally, EEOC severely underestimates the costs associated with implementing the abortion-accommodation mandate. For example, EEOC's economic analysis assumes that the Final Rule will impose no added costs on States. But Louisiana and Mississippi do not currently require employers to accommodate elective abortions that are prohibited by State law. Moreover, EEOC does not even try to quantify the costs associated with extending pregnancy-accommodation provisions to the number of women who obtain abortions annually—a figure pro-abortion groups have estimated at 860,000 per year. *E.g.*, Br. of *Amici Curiae* Am. College of Obstetricians & Gynecologists *et al.* 9, *Dobbs*, 597 U.S.  215. More still, EEOC failed to adequately account for the far different compliance obligations and costs the Final Rule will require of human resources officials within the States. All these errors and others like them underscore that EEOC has significantly misapprehended the impact of its Rule.

71.     EEOC's failure to consider these important aspects of the regulatory problem renders the abortion-accommodation mandate arbitrary and capricious under the APA and warrants enjoining and setting aside the Final Rule.

## COUNT IV
### Violation of U.S. Constitution and 5 U.S.C. § 706(2)(B)
### Article II and Separation of Powers

72.     Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

73.     EEOC's putative status as an "independent federal agency"—*i.e.*, whose heads are insulated from at-will removal by the President—violates Article II and the Separation of Powers.

74.     Article II of the Constitution vests "'the executive Power'—all of it'"—in the President. *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191 (2020) (quoting U.S. Const. art. II, § 1). That means the President must have the ability "to remove those who assist him in carrying out his duties." *Id.* (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513–14 (2010)). This requirement, moreover, extends to "multimember expert agencies" that "wield substantial executive power." *Id.* at 2199–200 (citing *Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935)). If "an agency does important work," Article II demands that its leaders be removable by the President. *Collins v. Yellen*, 141 S. Ct. 1761, 1784 (2021).

75.     The prevailing view in the caselaw—held by EEOC—is that EEOC's enabling statute constrains the President from removing EEOC Commissioners, except for cause. *See, e.g., Lewis v. Carter*, 436 F. Supp. 958, 961 (D.D.C. 1977); 42 U.S.C. § 2000e-4(a). Even if the President disagrees on policy with the Commissioners, therefore, he could not remove them (contrary to what at-will removal authority would permit); instead, he must cite malfeasance, inefficiency, or neglect of duty in any attempt to remove them.

76.     This restriction on the President's removal power violates Article II and the Separation of Powers. That is because EEOC unquestionably wields "quintessentially executive power[s]," including the authority to issue binding regulations and pursue enforcement actions in federal court on behalf of the United States. *Cf. Seila Law*, 140 S. Ct. at 2200; *see also Collins*, 141 S. Ct. at 1785–86. The

Final Rule's abortion-accommodation mandate on millions of employers proves the point. For that reason, EEOC can find no shelter under precedents like *Humphrey's Executor*, which permit removal restrictions for those multimember bodies who—entirely unlike EEOC—"perform[] legislative and judicial functions and [are] said not to exercise any executive power." *Seila Law*, 140 S. Ct. at 2199.[18]

77.     EEOC's unlawful structure taints the Final Rule and requires setting aside the Final Rule. *See Seila Law*, 140 S. Ct. at 2196; *see also Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023) (being subjected to "unconstitutionally insulated" agency decisionmaker is "here-and-now injury").[19]

**COUNT V**
**Declaratory Judgment Act, 28 U.S.C. § 2201 and 5 U.S.C. § 706**
**Claim for Declaratory Judgment**

78.     Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

79.     "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

80.     There is an actual controversy here because the Final Rule directly governs Plaintiffs in their capacity as employers, which affects Plaintiffs' rights and obligations, including by threatening to subject them to money damages and other relief for failure to provide abortion accommodations.

---

[18] The same argument could be couched in terms of constitutional avoidance: Because EEOC's structure is at least arguably unconstitutional, the Court should construe EEOC's enabling statute not to contain a for-cause removal restriction in the first place. *See, e.g., Calcutt v. FDIC*, 37 F.4th 293, 337–39 (6th Cir. 2022) (Murphy, J., dissenting), *rev'd on other grounds by* 598 U.S. 623 (2023) (per curiam). Either way, this constitutional defect is, in fact, a defect.

[19] Plaintiffs acknowledge that the Fifth Circuit's recent decision in *Consumers' Research v. Consumer Product Safety Commission*, 91 F.4th 342 (5th Cir. 2024), potentially forecloses this claim. Given the prospect of Supreme Court review (and reversal), however, Plaintiffs maintain this claim for preservation purposes. *See Consumers' Research v. Consumer Prod. Safety Comm'n*, 2024 WL 1643621, at *3 (5th Cir. Apr. 16, 2024) (Willett, J., concurring in the denial of rehearing en banc) (panel-decision author stating "while an en banc petition cannot push reset on *Humphrey's Executor*, a certiorari petition can," and "this cert petition writes itself"); *id.* at *3 (Ho, J., dissenting from denial of rehearing en banc) ("[A]ny statutory provision that restricts the President's power to remove principal executive officers is unconstitutional under Article II."); *id.* at *3 (Oldham, J., joined by Jones, Smith, Elrod, Ho, Duncan, Engelhardt, and Wilson, JJ., dissenting from the denial of rehearing en banc) ("The Supreme Court's precedents make clear the Commission's statutory for-cause removal protections violate the Constitution, so I would grant the petition for rehearing en banc.").

81.     Further, this controversy arises in this Court's jurisdiction, *see supra* ¶¶ 14–16, and Plaintiffs have filed an appropriate pleading to have their rights declared. The Court can resolve this controversy by declaring that EEOC may not require Plaintiffs—and employers within their borders—to accommodate employees' elective abortions that are illegal under State law.

## PRAYER FOR RELIEF

82.     Plaintiff States therefore request that the Court enter an order and judgment that grants the following relief, which it is authorized to do under 5 U.S.C. §§ 702, 705, 28 U.S.C. § 2201, and Federal Rules of Civil Procedure 57 and 65:

    a.   Declare that the Final Rule's abortion-accommodation mandate is contrary to law and in excess of statutory authority under the APA;

    b.   Declare that the Final Rule's abortion-accommodation mandate is *ultra vires* and invalid under the U.S. Constitution and the APA;

    c.   Declare that the Final Rule's abortion-accommodation mandate is arbitrary and capricious under the APA;

    d.   Declare the Final Rule *ultra vires* and invalid under the U.S. Constitution and the APA because EEOC's structure violates Article II and the Separation of Powers;

    e.   Vacate and set aside the Final Rule as unlawful under 5 U.S.C. § 706;

    f.   Postpone the June 18, 2024, effective date of the Final Rule and stay the Rule under 5 U.S.C. § 705;

    g.   Preliminarily and permanently enjoin, without bond, EEOC—and any other agency or employee of the United States—from enforcing or implementing the Final Rule's abortion-accommodation mandate; and

    h.   Grant all other relief the Court deems just and proper, as well as reasonable attorneys' fees and the costs of this action.

Dated: May 13, 2024

Respectfully submitted,

**ELIZABETH B. MURRILL**
**Attorney General of Louisiana**

 */s/ Tracy Short*
J. Benjamin Aguiñaga*
  *Solicitor General*
Tracy Short (La #23940)
  *Assistant Chief Deputy Attorney General*
OFFICE OF THE LOUISIANA ATTORNEY
GENERAL
1885 North Third Street
Baton Rouge, LA 70804
(225) 326-6766
aguinagab@ag.louisiana.gov
shortt@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

**LYNN FITCH**
**Attorney General of Mississippi**

 */s/ Justin L. Matheny*
Justin L. Matheny*
  *Deputy Solicitor General*
MISSISSIPPI ATTORNEY GENERAL'S
OFFICE
P.O. Box 220
Jackson, MS 39205
(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of
Mississippi*