# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

|  |  |
|---|---|
| STATE OF LOUISIANA, *et al.*, | |
| *Plaintiffs,* | |
| v. | Case No. 2:24-cv-629 |
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | |
| *Defendant.* | |
| UNITED STATES CONFERENCE OF CATHOLIC BISHOPS, *et al.*, | |
| *Plaintiffs,* | |
| v. | Case No. 2:24-cv-691 |
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, *et al.*, | |
| *Defendants.* | |

## DEFENDANTS' COMBINED MEMORANDUM
## IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

BACKGROUND .........................................................................................................................2

I.    THE PWFA FRAMEWORK ............................................................................................2

II.   EEOC'S RULEMAKING IMPLEMENTING THE PWFA .............................................4

III.  PROCEDURAL HISTORY ..............................................................................................5

IV.   DISPUTED FACTS ..........................................................................................................5

STANDARD OF REVIEW ..........................................................................................................8

ARGUMENT ...............................................................................................................................8

I.    THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS .....................8

      A.    Plaintiffs Do Not Have Standing Because Their Alleged Injuries are Too
            Speculative ...............................................................................................................8

      B.    Plaintiffs' Theories of Injury Fail for Additional Reasons ....................................11

            1.    Compliance Costs Do Not Establish Standing .............................................11

            2.    The Final Rule Does Not Interfere with Any State Policy .............................13

            3.    The States Have Not Demonstrated Any Speech Injury ................................14

      C.    Plaintiffs Have Not Proven Their Injuries Are Redressable ..................................14

      D.    Plaintiffs' Claims Are Not Ripe Given Their Fact-Specific Nature ......................16

II.   THE FINAL RULE PROPERLY PROVIDES THAT EMPLOYEES MAY SEEK
      ACCOMODATIONS FOR ABORTION .........................................................................17

      A.    Title VII's Text Encompasses Employment Protections for Abortion, and
            Congress Used the Same Language in the PWFA ..................................................17

      B.    The Text of the PWFA Itself Covers Abortions ....................................................21

      C.    Materials Outside the PWFA's Text Do Not Change the Analysis ........................24

III.  THE STATES' REMAINING CLAIMS LACK MERIT .................................................26

      A.    The PWFA Validly Abrogates State Sovereign Immunity .....................................26

      B.    The Final Rule Does Not Violate the Plaintiff States' Free Speech Rights ............27

C.    The Final Rule Does Not Improperly Infringe on State Sovereignty ........................... 29

D.    The Final Rule Does Not Violate Article II and Separation of Powers ...................... 30

IV.   THE BISHOPS ARE NOT ENTITLED TO A PREENFORCEMENT BLANKET RFRA EXCEPTION ........................................................................................ 31

A.    The Final Rule's Case-by-Case Approach for Evaluating RFRA Defenses Is Not a Substantial Burden ................................................................................ 31

B.    The Court Should Not Grant the Bishops a Blanket RFRA Exemption ................... 33

V.    THE BISHOPS' OTHER CLAIMS ALSO FAIL ............................................................ 36

A.    The Bishops' Free Exercise Claim Fails with Their RFRA Claim ............................ 36

B.    The Final Rule Lawfully Interprets the PWFA's Rule of Construction Pertaining to Religious Employers ................................................................................ 37

C.    The Final Rule Does Not Violate the Church Autonomy Doctrine ........................... 41

D.    The Final Rule Does Not Violate the Free Speech Clause .............................................. 42

VI.   THE COURT SHOULD NOT GRANT PLAINTIFFS' REQUESTED REMEDIES ........................................................................................................................... 44

A.    Nationwide Relief, Including Vacatur, is Not Appropriate in This Case ................... 45

B.    Appropriately Tailored Injunctive and Declaratory Relief Fully Remedy Plaintiffs' Asserted Harms ........................................................................................ 47

CONCLUSION ........................................................................................................................... 50

# TABLE OF AUTHORITIES

## CASES

*Abbott Lab'ys. v. Gardner,*
   387 U.S. 136 (1967) ...................................................................................16

*Advantage Media, L.L.C. v. City of Eden Prairie,*
   456 F.3d 793 (8th Cir. 2006) .......................................................................15

*Alden v. Maine,*
   527 U.S. 706 (1999) ...................................................................................16

*Alfred L. Snapp & Son, Inc. v. P.R., ex rel., Barez,*
   458 U.S. 592 (1982) ...................................................................................14

*Alvarado v. Mine Serv., Ltd.,*
   626 F. App'x 66 (5th Cir. 2015) ....................................................................4

*Barnes v. Hewlett-Packard Co.,*
   846 F. Supp. 442 (D. Md. 1994) ..................................................................18

*Billard v. Charlotte Catholic High Sch.,*
   101 F.4th 316 (4th Cir. 2024) ......................................................................39

*Boy Scouts of Am. v. Dale,*
   530 U.S. 640 (2000) ...................................................................................43

*Braidwood Mgmt., Inc. v. EEOC,*
   70 F.4th 914 (5th Cir. 2023) ...............................................................31, 32

*Brown v. Collier,*
   929 F.3d 218 (5th Cir. 2019) ......................................................................32

*Bryce v. Episcopal Church in the Diocese of Colo.,*
   289 F.3d 648 (10th Cir. 2002) ....................................................................41

*Burwell v. Hobby Lobby Stores, Inc.,*
   573 U.S. 682 (2014) ....................................................................31, 36, 49

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) ...................................................................................45

*California v. EPA,*
   72 F.4th 308 (D.C. Cir. 2023) .....................................................................29

*California v. Texas,*
   593 U.S. 659 (2021) .....................................................................................8

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023), *aff'd*, 602 U.S. 406 (2024) ..........................................45

*City of Boerne v. Flores,*
  521 U.S. 507 (1997) ..........................................................................................26, 27

*Clackamas Gastroenterology Assocs., P. C. v. Wells,*
  538 U.S. 440 (2003) ................................................................................................35

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ....................................................................................10, 11, 13

*Clark v. Martinez,*
  543 U.S. 371 (2005) ................................................................................................20

*Cline v. Cath. Diocese of Toledo,*
  206 F.3d 651 (6th Cir. 2000) ...................................................................................39

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n,*
  91 F.4th 342 (5th Cir. 2024), *cert denied*, No. 23-1323 (U.S. Oct. 21, 2024) ...................9, 30

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n,*
  --- S. Ct. ---, 2024 WL 4529808 (Oct. 21, 2024) .....................................................30

*Curay-Cramer v. Ursuline Academy,*
  450 F.3d 130 (3d Cir. 2006) ....................................................................................39

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.,*
  45 F.4th 846 (5th Cir. 2022) ...................................................................................45

*Dep't of Homeland Sec. v. New York,*
  140 S. Ct. 599 (2020) ..............................................................................................46

*Dobbs v. Jackson Women's Health Org.,*
  597 U.S. 215 (2022) ................................................................................................20

*Doe v. C.A.R.S. Protection Plus, Inc.,*
  527 F.3d 358 (3d Cir. 2008) ....................................................................................21

*Ducharme v. Crescent City Deja Vu, L.L.C.,*
  406 F. Supp. 3d 548 (E.D. La. 2019) ...............................................................15, 18

*Edelman v. Lynchburg College,*
  535 U.S. 106 (2002) ................................................................................................50

*EEOC v. Aramco,*
499 U.S. 244 (1991), *abrogated on other grounds by Arbaugh v. Y&H Corp.,* 546 U.S. 500, 511 (2006) ..................................40

*EEOC v. Catholic University,*
83 F.3d 455 (D.C. Cir. 1996) ..................................33, 42

*EEOC v. Hous. Funding II, Ltd.,*
717 F.3d 425 (5th Cir. 2013) ..................................21

*EEOC v. Miss. Coll.,*
626 F.2d 477 (5th Cir. 1980) ..................................*passim*

*EEOC v. Sw. Baptist Theological Seminary,*
651 F.2d 277 (5th Cir. 1981) ..................................42

*Employment Division v. Smith,*
494 U.S. 872 (1990) ..................................37

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) ..................................48

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.,*
82 F.4th 664 (9th Cir. 2023) ..................................37

*Fitzpatrick v. Bitzer,*
427 U.S. 445 (1976) ..................................27

*Franciscan All., Inc. v. Becerra,*
553 F. Supp. 3d 361 (N.D. Tex. 2021) ..................................32

*Franciscan Alliance, Inc. v. Becerra,*
47 F.4th 368 (5th Cir. 2022) ..................................32

*Free Enterprise Fund v. Pub. Co. Acct. Oversight Bd.,*
561 U.S. 477 (2010) ..................................30

*Fulton v. City of Philadelphia,*
593 U.S. 522 (2021) ..................................37

*Gann v. Fruehauf Corp.,*
52 F.3d 1320 (5th Cir. 1995) ..................................17, 20

*Gen. Elec. Co. v. Gilbert,*
429 U.S. 125 (1976) ..................................2

*George v. McDonough,*
596 U.S. 740 (2022) ..................................19

*Gill v. Whitford,*
   585 U.S. 48 (2018) .......................................................................... 45, 47, 48, 49

*Glass v. Paxton,*
   900 F.3d 233 (5th Cir. 2018) ...................................................................... 10

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, ("O Centro"),*
   546 U.S. 418 (2006) ......................................................................... 31, 35, 48

*Haaland v. Brackeen,*
   599 U.S. 255 (2023) ............................................................................ 8, 48

*Hall v. Baptist Mem'l Health Care Corp.,*
   215 F.3d 618 (6th Cir. 2000) ...................................................................... 40

*Harper v. Lumpkin,*
   64 F.4th 684 (5th Cir. 2023) ....................................................................... 30

*Hishon v. King & Spalding,*
   467 U.S. 69 (1984) ............................................................................... 43

*Holt v. Hobbs,*
   574 U.S. 352 (2015) ............................................................................. 35

*Humphrey's Ex'r v. United States,*
   295 U.S. 602 (1935) ............................................................................. 30

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
   515 U.S. 557 (1995) ............................................................................. 28

*Illumina, Inc. v. FTC,*
   88 F.4th 1036 (5th Cir. 2023) ..................................................................... 30

*In re Union Pac. R.R. Emp. Pracs. Litig.,*
   479 F.3d 936 (8th Cir. 2007) ............................................................... 7, 20, 21

*Katzenbach v. Morgan,*
   384 U.S. 641 (1996) ............................................................................. 27

*Keene Corp. v. United States,*
   508 U.S. 200 (1993) ............................................................................. 25

*Labrador v. Poe ex rel. Poe,*
   144 S. Ct. 921 (2024) ............................................................................ 46

*Lake Carriers' Ass'n v. MacMullan,*
   406 U.S. 498 (1972) ........................................................................... 9, 11

*Lewis v. Casey,*
    518 U.S. 343 (1996) ...................................................................................47

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
    591 U.S. 657 (2020) ...................................................................................31

*Little v. Wuerl,*
    929 F.2d 944 (3d Cir. 1991) ................................................................ 40, 43

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .............................................................................8, 9, 49

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) .....................................................................47, 48, 49

*Maitland v. Univ. of Minn.,*
    260 F.3d 959 (8th Cir. 2001) ......................................................................27

*McClure v. Salvation Army,*
    460 F.2d 553 (5th Cir. 1972) ......................................................................39

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.,*
    966 F.3d 346 (5th Cir. 2020) ......................................................................41

*Murthy v. Missouri,*
    144 S. Ct. 1972 (2024) .........................................................................*passim*

*Nat'l Conf. of Cath. Bishops v. Smith,*
    653 F.2d 535 (D.C. Cir. 1981) ..............................................................*passim*

*Nat'l Lab. Rels. Bd. v. Bell Aerospace Co., Div. of Textron Inc.,*
    416 U.S. 267 (1974) ............................................................................ 29, 39

*Nev. Dep't of Hum. Res. v. Hibbs,*
    538 U.S. 721 (2003) ...................................................................................27

*Okpalobi v. Foster,*
    244 F.3d 405 (5th Cir. 2001) ......................................................................15

*O'Shea v. Littleton,*
    414 U.S. 488 (1974) ...................................................................................10

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
    591 U.S. 732 (2020) ...................................................................................41

*Roark v. S. Iron R-1 Sch. Dist.,*
    573 F.3d 556 (8th Cir. 2009) ......................................................................44

*Rumsfeld v. Forum for Acad. & Institutional* Rts. In*c., ("FAIR"),*
   547 U.S. 47 (2006) ........................................................................................ 28, 44

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
   591 U.S. 197 (2020) ............................................................................................. 30

*Shekoyan v. Sibley Int'l,*
   409 F.3d 414 (D.C. Cir. 2005), *cert. denied* 546 U.S. 1173 (2006) ...................... 40

*Sierra Club v. City of San Antonio,*
   115 F.3d 311 (5th Cir. 1997) ............................................................................... 34

*Smith v. City of Jackson,*
   544 U.S. 228 (2005) ............................................................................................. 19

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.,*
   41 F.4th 931 (7th Cir. 2022) ............................................................................... 39

*Starkman v. Evans,*
   198 F.3d 173 (5th Cir. 1999) ............................................................................... 41

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) ............................................................................................... 13

*Sw. Elec. Power Co. v. U.S. EPA,*
   920 F.3d 999 (5th Cir. 2019) ............................................................................... 47

*Tandon v. Newsom,*
   593 U.S. 61 (2021) ............................................................................................... 36

*Telescope Media Grp. v. Lucero,*
   936 F.3d 740 (8th Cir. 2019) ............................................................................... 28

*Tennessee v. EEOC,*
   ---F. Supp. 3d---, 2024 WL 3012823 (E.D. Ark. June 14, 2024),
   *appeal filed*, No. 24-2249 (8th Cir. June 20, 2024) ................................... *passim*

*Tennessee v. Lane,*
   541 U.S. 509 (2004) ............................................................................................. 26

*Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n,*
   989 F.3d 368 (5th Cir. 2021) ............................................................................... 45

*Texas v. EEOC,*
   933 F.3d 433 (5th Cir. 2019) ............................................................................... 44

*Texas v. Garland,*
   719 F. Supp. 3d 521 (N.D. Tex. 2024), *appeal filed*, No. 24-10386 (5th Cir. May 1, 2024) ............... 15

*Toilet Goods Ass'n, Inc. v. Gardner*,
     387 U.S. 158 (1967) ...................................................................................................16

*U.S. Navy SEALs 1-26 v. Biden*,
     578 F. Supp. 3d 822 (N.D. Tex. 2022) ...................................................................37

*United States v. Lee*,
     455 U.S. 252 (1982) ...................................................................................................35

*United States v. Texas*,
     599 U.S. 670 (2023) ............................................................................................ 14, 45

*US Airways, Inc. v. Barnett*,
     535 U.S. 391 (2002) ...................................................................................................19

*Va. ex rel. Cuccinelli v. Sebelius*,
     656 F.3d 253 (4th Cir. 2011) ...................................................................................14

*Valentine Props. Assocs., LP v. U.S. Dep't of Hous. & Urb. Dev.*,
     785 F. Supp. 2d 357 (S.D.N.Y. 2011), *aff'd*, 501 F. App'x 16 (2d Cir. 2012). ...................29

*Valley Force Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
     454 U.S. 464 (1982) ...................................................................................................48

*Wallace v. Pyro Mining Co.*,
     789 F. Supp. 867 (W.D. Ky. 1990), *aff'd* 951 F.2d 351 (6th Cir. 1991) ...............18

*Weathers v. Hous. Methodist Hosp.*,
     116 F.4th 324, 330 (5th Cir. 2024) ...........................................................................4

*West v. Gibson*,
     527 U.S. 212 (1999) ...................................................................................................46

*West Virginia v. EPA*,
     597 U.S. 697 (2022) ............................................................................................ 25, 26

*Young v. United Parcel Serv., Inc.*,
     575 U.S. 206 (2015) .....................................................................................................3

*Zimmerman v. City of Austin*,
     881 F.3d 378 (5th Cir. 2018) ......................................................................10, 14, 28

*Zipes v. Trans World Air., Inc.*,
     455 U.S. 385 (1982) .....................................................................................................4

## STATUTES

5 U.S.C. § 703 ................................................................................................................45

29 U.S.C. § 630 ..............................................................................................................35

29 U.S.C. § 2611 ............................................................................................................35

42 U.S.C. § 2000bb-1 .....................................................................................................48

42 U.S.C. § 2000e ......................................................................................................passim

42 U.S.C. § 2000e-1 .........................................................................................37, 38, 40

42 U.S.C. § 2000e-2 ..........................................................................................................2

42 U.S.C. § 2000e-3 ..........................................................................................................3

42 U.S.C. § 2000e-4 ........................................................................................................30

42 U.S.C. § 2000e-5 ...................................................................................................passim

42 U.S.C. § 2000e-6 .................................................................................................. 4, 16

42 U.S.C. § 2000gg ....................................................................................................passim

42 U.S.C. § 2000gg-1 ................................................................................................. 3, 19

42 U.S.C. § 2000gg-2 ...........................................................................................3, 16, 46

42 U.S.C. § 2000gg-3 ........................................................................................................1

42 U.S.C. § 2000gg-5 ................................................................................ 25, 36, 38, 43

42 U.S.C. § 2000gg-6 .....................................................................................................47

42 U.S.C. § 12111 ...........................................................................................................35

Pub. L. No. 117-328, div. II, 136 Stat. 4459, 6084-89 (2022),
    with an effective date of June 27, 2023 ....................................................................3

## LEGISLATIVE HISTORIES

H.R. Conf. Rep. No. 95-1786 (1978) ............................................................................18

H.R. Rep. No. 117-27 (2021) .....................................................................................passim

H.R. Rep. No. 95-948 (1978) ............................................................................................ 2, 3, 18

167 Cong. Rec. H2226 (daily ed. May 12, 2021) ................................................................ 24

167 Cong. Rec. H2321 (daily ed. May 14, 2021) .......................................................... 24, 27

**RULES**

Fed. R. Civ. P. 56 ..................................................................................................................... 8

L.R. 56.2(2) ......................................................................................................................... 5, 6

**REGULATIONS**

29 C.F.R. § 1601.28 ............................................................................................................... 49

29 C.F.R. pt. 1604 .................................................................................................................. 3

29 C.F.R. § 1636.8 ................................................................................................................ 47

E.O. 12,866 ........................................................................................................................... 30

E.O. 13,132 ........................................................................................................................... 30

E.O. 13,563 ........................................................................................................................... 29

E.O. 14,094 ........................................................................................................................... 30

*Implementation of the Pregnant Workers Fairness Act,*
    89 Fed. Reg. 29,096 (Apr. 19, 2024) ...................................................................... *passim*

**OTHER AUTHORITIES**

EEOC, *Compliance Manual on Religious Discrimination*, (12-I)(C) (2021),
    https://perma.cc/GJ6R-BLZL ........................................................................................ 43

La. St. Civil Serv., Civil Service Rules (Jan. 1, 2024),
    https://perma.cc/6BBU-74A9 ........................................................................................ 11

Miss. St. Pers. Bd., Miss. State Employee Handbook (July 1, 2024),
    https://perma.cc/9E6A-9H4B ........................................................................................ 11

## INTRODUCTION

As the Court is aware from prior filings and proceedings in this matter, the Pregnant Workers Fairness Act (PWFA) is an anti-discrimination statute that builds on Title VII of the Civil Rights Act of 1964 (Title VII) and other laws to expand workplace protections for employees with pregnancy-related conditions. The Equal Employment Opportunity Commission (EEOC) issued a Final Rule implementing the PWFA. *See* 42 U.S.C. § 2000gg-3; *Implementation of the Pregnant Workers Fairness Act*, 89 Fed. Reg. 29,096 (Apr. 19, 2024) (hereafter "Final Rule"). Plaintiffs in these combined cases—*i.e.*, the States of Louisiana and Mississippi ("States" or "Plaintiff States"), and the *USCCB* Plaintiffs (collectively, "Bishop Plaintiffs" or "Bishops")[1]—now primarily challenge the Final Rule because, in their view, the Final Rule (1) improperly requires accommodations for certain abortions and (2) ignores the Bishop Plaintiffs' religious rights. The Court should deny Plaintiffs' motion for summary judgment for several reasons.

First, Plaintiffs have failed to carry their heightened burden at summary judgment of proving their standing, as the factual record now confirms. They make no effort to prove that any female employee will likely (much less imminently) request from any Plaintiff employer the type of accommodation to which Plaintiffs object. That defect is fatal, as Plaintiffs do not have standing to challenge a legal obligation that, as of now, is entirely hypothetical.

Second, Plaintiffs' claims lack merit. Although they purport to analyze the relevant statutes' text, they continue to ignore that the PWFA's text covers abortion-related accommodations. The relevant statutory language in the PWFA mirrors the text of Title VII—"pregnancy, childbirth, or related medical conditions"—which encompasses abortion. Plaintiffs offer no plausible justification for why that phrase should be construed differently under the PWFA, which was intended to *broaden* Title VII's protections, and contrary to the settled canons of statutory construction. As for the Bishops' religion-based challenges, the Final Rule lawfully adopts a case-by-case approach for

---

[1] The USCCB Plaintiffs include the U.S. Conference of Catholic Bishops, The Society of the Roman Catholic Church of the Diocese of Lake Charles, The Society of the Roman Catholic Church of the Diocese of Lafayette, and The Catholic University of America.

evaluating Religious Freedom Restoration Act (RFRA) and other religion-related defenses, particularly because such issues are inherently fact-specific.

Finally, even if this Court were to disagree and grant relief to Plaintiffs, any such relief must be tailored to the Plaintiffs' claims, limited to the Plaintiffs themselves as employers, and not curtail the rights of third parties who are not before this Court. Settled equitable principles and black-letter law provide that relief should not sweep more broadly than necessary to remedy any purported injuries to Plaintiffs. Plaintiffs have not even attempted to show that relief would properly extend beyond the named Plaintiffs in their capacities as employers. Thus, if the Court decides to grant declaratory or injunctive relief, any such relief should be limited to the Plaintiffs and should not purport to enjoin or vacate the challenged portion of the Final Rule more broadly.

## BACKGROUND

## I.    THE PWFA FRAMEWORK

Congress enacted the PWFA to "fill a gap in the existing legal framework," H.R. Rep. No. 117-27, at 10 (2021) (EEOC_136670), which offered only limited protections for workers affected by pregnancy, *see id.* at 10-26. In doing so, Congress sought to expand on Title VII's protections. *See* 42 U.S.C. § 2000e-2(a)(1). After the Supreme Court issued a decision construing an earlier iteration of Title VII as excluding pregnancy discrimination, *see Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976), Congress enacted the Pregnancy Discrimination Act (PDA) to amend Title VII and expressly provide that sex discrimination encompasses pregnancy discrimination:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work[.]

42 U.S.C. § 2000e(k). Congress made clear that this "basic language covers decisions by women who chose to terminate their pregnancies." H.R. Rep. No. 95-948, at 7 (1978) (EEOC_136008). Recognizing that the amended definition of sex discrimination included discrimination on the basis of a worker's decision to have or not have an abortion, Congress included additional language in that

subsection to address concerns that employers would be required to pay for abortions:

> This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion[.]

42 U.S.C. § 2000e(k); *see* H.R. Rep. No. 95-948, at 7 (EEOC_136008). Shortly after this amendment, EEOC promulgated guidelines confirming that the PDA protects employees who have (or do not have) abortions, and requires employers to provide benefits, such as leave, for abortions to the same extent such benefits are afforded for other medical reasons. *See* 29 C.F.R. part 1604, App'x, Questions 34-37. EEOC has maintained this position for over forty years.

Even after the PDA, however, Title VII required pregnancy-related accommodations in only certain circumstances. *See Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 229 (2015). To address these and other gaps in statutory protections, *see* H.R. Rep. No. 117-27, at 14-20 (EEOC_136674-80), Congress enacted the PWFA as part of the Consolidated Appropriations Act, 2023, *see* Pub. L. No. 117-328, div. II, 136 Stat. 4459, 6084-89 (2022), with an effective date of June 27, 2023, *see id.* § 109, 136 Stat. at 6089.

In general, the PWFA requires covered employers to "make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee, unless . . . the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]" 42 U.S.C. § 2000gg-1(1). The PWFA borrows heavily from existing statutes. For example, Congress defined both "reasonable accommodation" and "undue hardship" by reference to the Americans with Disabilities Act (ADA). *See id.* § 2000gg(7). Congress also included anti-retaliation and anti-coercion provisions similar to those in Title VII and the ADA, which make it unlawful to discriminate against employees who file charges or participate in investigations, or to "coerce, intimidate, threaten, or interfere with any individual['s]" exercise of rights under the statute, *id.* § 2000gg-2(f)(1), (2); *see also id.* §§ 2000e-3(a) (Title VII anti-retaliation), 12203(b) (ADA anti-coercion). The PWFA's definition of employer is likewise the same as Title VII's. *See id.* § 2000gg(2)(B).

The PWFA incorporates Title VII's remedies and enforcement procedures. *See id.* § 2000gg-2.

An individual who believes their rights were violated must file a Charge of Discrimination with EEOC. *Id.* § 2000e-5(b). EEOC notifies the employer of the charge, investigates it, and then determines whether "reasonable cause" exists to believe the statute was violated. *Id.* If EEOC does not find "reasonable cause" or determines that an employer defense applies, the charge is dismissed, and the employee may file suit within 90 days of receiving a Notice of Right to Sue (NRTS), which EEOC is required to issue. *Id.* § 2000e-5(b), (f)(1). If reasonable cause exists, EEOC attempts to conciliate the charge; if that fails, EEOC either files suit against the employer or issues an NRTS to the charging party.[2] This process is generally the same for State employers, except, if conciliation fails, EEOC refers the matter to the Department of Justice (DOJ) to make a determination of whether to sue. *See id.* DOJ also has independent authority (regardless of any EEOC referral) to sue based on "pattern or practice" violations. *Id.* § 2000e-6(a).

## II.    EEOC'S RULEMAKING IMPLEMENTING THE PWFA

In its Final Rule, EEOC explained that because the PWFA uses the same statutory language as Title VII—"pregnancy, childbirth, or related medical conditions"—and because the PWFA was intended to fill gaps in the existing Title VII framework, that language in the PWFA has the same meaning as in Title VII. *See* 89 Fed. Reg. at 29,105-14. And because Title VII's language protects employees who choose to have, or not have, an abortion, so does the PWFA. *See id.*; *see also id.* at 29,111. The PWFA's application to abortion, however, is narrow: the Final Rule "does not regulate the provision of abortion services or affect whether and under what circumstances an abortion should be permitted"; "does not require any employee to have—or not to have—an abortion"; does not require employers or "taxpayers to pay for any abortions[;] and does not compel health care providers to provide any abortions." *Id.* at 29,104; 29,157. Rather, "any requests for accommodations related to abortion will typically involve the provision of unpaid leave." *Id.* at 29,113.

As for anti-retaliation and anti-coercion, the Final Rule borrows from the ADA and Title VII.

---

[2] The time limits for filing a charge and suit are not jurisdictional and are subject to waiver, estoppel, and equitable tolling. *Zipes v. Trans World Air., Inc.*, 455 U.S. 385, 393 (1982); *Alvarado v. Mine Serv., Ltd.*, 626 F. App'x 66, 69 (5th Cir. 2015); *Weathers v. Hous. Methodist Hosp.*, 116 F.4th 324, 330 (5th Cir. 2024).

*See id.* at 29,148. The anti-coercion "provision does not apply to any and all conduct or statements that an individual finds intimidating; it prohibits only conduct that is reasonably likely to interfere with the exercise or enjoyment of PWFA rights." *Id.* As such, "general statements regarding an employer's mission or religious beliefs [are] not the type of conduct that . . . would be prohibited[.]" *Id.*

EEOC also emphasized that employers have defenses to charges. *See id.* at 29,146-55. Those include statutory protections such as undue hardship, RFRA, and the PWFA's Rule of Construction related to religious employers, *id.* at 29,144-48, as well as constitutional protections, like the First Amendment's ministerial exception, *id.* at 29,150. For each defense, EEOC described the general legal framework and committed to evaluating it "on a case-by-case basis," similar to Title VII. *E.g.*, *id.* at 29,145. EEOC also enhanced administrative procedures for raising and deciding religious defenses, including allowing employers to request that "EEOC prioritize the consideration of a particular defense that could be dispositive and obviate the need to investigate the merits of a charge." *Id.* at 29,147-48.

## III.   PROCEDURAL HISTORY

The States and Bishops filed suit on May 13 and May 24, 2024, respectively. On June 17, 2024, this Court preliminarily enjoined enforcement of "the Final Rule's requirement that covered entities provide accommodation for the elective abortions of employees that are not necessary to treat a medical condition related to pregnancy" against the Bishops, the Plaintiff States and their agencies, and "[a]ny covered entity . . . with respect to all employees whose primary duty station is located in Louisiana or Mississippi." *La.*, ECF No. 47 at 31 ("PI Order"). The Final Rule took effect on June 18, 2024. *See* 89 Fed. Reg. at 29,096. The Parties filed dispositive motions on October 10, 2024.

## IV.   DISPUTED FACTS

Many of Plaintiffs' assertions in their statements of undisputed facts lack "reference to the document or other exhibit that establishes each fact," L.R. 56.2(2), and in any event, the vast majority are legal conclusions—not issues of material fact. Defendants object to these assertions as not only

disputed but improper, and thus not requiring a response. Out of an abundance of caution, however, Defendants set forth below certain points that are disputed.[3]

Neither set of Plaintiffs has articulated any material facts demonstrating their standing. *See La.*, ECF No. 70-1 ("Sts. Br.") at 2-7; *USCCB*, ECF No. 77-1 ("USCCB Br.") at 2-7. The Final Rule is not an "abortion-accommodation mandate," and does not "require" accommodation of any specific care in all circumstances, *contra* Sts. Br. at 4, 5; USCCB Br. at 3-5, such as where "prohibited by an employer State's law," Sts. Br. at 4, or "contrary to the Bishops' sincerely held religious beliefs," USCCB Br. at 5, 6. The Final Rule does not mandate *any* action—or inaction—in particular, *contra* USCCB Br. at 4-5; Sts. Br. at 4, or eliminate or prejudge any legal defenses, *contra* USCCB Br. at 5. Rather, the Final Rule "includes abortion in its definition of 'pregnancy, childbirth, or related medical conditions,'" 89 Fed. Reg. 29,104, and recognizes that whether an accommodation is required depends on the specific circumstances, including "[a]ny potential interaction or conflict between PWFA and State laws," *id.* at 29,112; *see id.* at 29,125, and applicability of "numerous statutory and constitutional defenses," *id.* at 29,114, like the Rule of Construction, *id.* at 29,220, undue hardship, *id.* at 29,125, RFRA, *id.* at 29,148, the ministerial exception, *id.* at 29,150, and the First Amendment, *id.* at 29,152—all of which are considered on a "case-by-case basis," *id.* at 29,112-13; 29,125; 29,114; 29,148; 29,150; 29,152; 29,220; and are not "predicted to fail," *contra* USCCB Br. at 5.

As for the Rule of Construction specifically, the Final Rule does not "adopt[] a limited interpretation that protects only against PWFA claims of religious discrimination," *USCCB* Br. at 5. Instead, the Final Rule makes clear that employers can invoke, and EEOC will consider, the defense in response to *any* charge: "If a qualifying religious organization asserts as a defense to a claim under the PWFA that it took the challenged action on the basis of religion and that section 107(b) should apply, the merits of any such asserted defense will therefore be determined on a case-by-case basis consistent with the facts presented and applicable law." 89 Fed. Reg. at 29,147.

---

[3] While Defendants dispute certain factual assertions pursuant to the mandates of Local Rule 56.2, they do not believe that there are genuine issues of fact that would preclude summary judgment in their favor.

The Final Rule is not an "*anti*-pregnancy mandate," Sts. Br. at 4. It protects employees who have, *and do not have*, abortions. 89 Fed. Reg. 29,101, 29,154-55 & n.313; *see also id.* at 29,111 (Final Rule "does not in any way promote abortion"); *id.* at 29,157 (PWFA protects against employers who "may pressure their employees into having abortions by refusing to provide any pregnancy-related accommodations other than leave to obtain an abortion."). The Final Rule encompasses abortion based on the plain language of Title VII and the PWFA. *Id.* at 29,106-08; *infra* § II.A-B; *contra* USCCB Br. at 2, 4. The Administrative Record contains ample support for why the PWFA's provision mirroring Title VII should be interpreted synchronously with Title VII, *contra* USCCB Br. at 2, including comments from over 100 lawmakers recognizing this as the proper construction, *e.g.*, EEOC_134582; EEOC_133187-88; EEOC_134179. Nor are the PDA's relevant terms more expansive than the PWFA's. *See infra* at § II.A; 42 U.S.C. § 2000gg(4); *In re Union Pac. R.R. Emp. Pracs. Litig.*, 479 F.3d 936, 942 n.2 (8th Cir. 2007); *contra* USCCB Br. at 4. The Final Rule also recognizes that, consistent with caselaw interpreting Title VII, the PWFA may cover accommodations related to contraception and fertility treatments "depending upon the facts of the case." 89 Fed. Reg. 29,102-03; *contra* USCCB Br. at 4.

The Bishop Plaintiffs assert that "the Final Rule pressures the Bishops to knowingly accommodate employees or faculty even where such accommodations are contrary to the Bishops' sincerely held religious beliefs." USCCB Br. at 6. But the Final Rule does not require them to provide such accommodations (as discussed above), and the Bishops' declarations do not articulate any true "pressure" to modify their behavior as a result of the Final Rule. *See* 3d Ridderhoff Decl. (*USCCB*, ECF No. 77-4) ¶ 31; 2d Brown Decl. (*USCCB*, ECF No. 77-5) ¶¶ 25-27; 3d Caraway Decl. (*USCCB*, ECF No. 77-6) ¶ 11; Second Fontenot Decl. ¶ 11. Indeed, EEOC, for over four decades, has interpreted Title VII to require certain accommodations with respect to abortion, and the Bishops have not identified a single charge or enforcement action filed against them on the issue in the interim. *See, e.g.*, *Nat'l Conf. of Cath. Bishops v. Smith*, 653 F.2d 535, 540 (D.C. Cir. 1981) (predecessor entity to USCCB lacked standing to challenge PDA's coverage of abortion).

## STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ARGUMENT

## I.    THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS

"Article III requires a plaintiff to show that [it] has suffered an injury in fact that is 'fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Haaland v. Brackeen*, 599 U.S. 255, 291-92 (2023) (quoting *California v. Texas*, 593 U.S. 659, 669 (2021)); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). While this Court previously determined that Plaintiffs were "likely" to demonstrate standing, PI Order at 8, Plaintiffs cannot satisfy the heightened burden at summary judgment of demonstrating "specific facts" supporting each element of standing. *Lujan*, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)). This is particularly true given that neither set of Plaintiffs addresses standing in their Statement of Material Facts—and these shortcomings demonstrate that Plaintiffs have not carried their burden to prove, with specific facts, their standing to challenge the Final Rule. *Cf.* Fed. R. Civ. P. 56(a) (summary judgment requires the movant to "show[] that there is no genuine dispute as to any material fact"). Plaintiffs' lack of facts to support their standing deprives Defendants of the opportunity to highlight why Plaintiffs' specific factual theories as to their standing are incorrect. Indeed, the Bishops' motion wholly fails to address this necessary element of their claims. Regardless, the record here independently confirms that Plaintiffs have not proven their standing.

### A.    Plaintiffs Do Not Have Standing Because Their Alleged Injuries are Too Speculative

The States are incorrect to assert that they have standing to challenge the Final Rule even though they have failed to show any concrete and actual or imminent injury. *See* Sts. Br. at 9-10. Simply asserting that a regulation could theoretically apply to one's actions in the future, if an attenuated sequence of events occurs, is not enough to assert that the regulation imposes an Article III injury. Any contrary conclusion would undermine the fundamental tenets of standing. "[E]very American is subject to a great many regulations" and "merely being subject to those regulations, in the abstract,

8

does not create an injury." *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 350 (5th Cir. 2024), *cert denied*, No. 23-1323 (U.S. Oct. 21, 2024). Rather, a regulated party must still establish an "actual or imminent" injury. *Lujan*, 504 U.S. at 560-61; *see Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 507 (1972). Plaintiffs cannot show a regulatory injury because unless and until an employee requests leave or another accommodation in the very specific circumstances that Plaintiffs contest,[4] the Final Rule does not require Plaintiffs to take any action and imposes no requisite burdens.

It is also extremely speculative that any such request will be made by a Plaintiff-employee. Plaintiffs have not identified *any* of their thousands of employees who has ever sought an accommodation or leave for abortion or the other matters to which Plaintiffs object. *See* Defs.' Statement of Material Facts ("SMF") ¶¶ 1-8; Hudson USCCB Decl. (*USCCB*, ECF No. 75-4) ¶¶ 9-10 (discussing PWFA charge data); 2d Hudson Decl. ¶¶ 4-5 (same re Title VII). And Plaintiffs will not suffer any injuries stemming from an asserted duty to accommodate under the Final Rule unless numerous contingencies all occur leading an employee to actually request such an accommodation, which is inherently speculative as previously discussed, *see La.*, ECF No. 68-1 ("Defs' Br.") at 8, and which Plaintiffs' factual record here does not even attempt to establish. Indeed, as other courts have recognized, it is especially improbable that one of Plaintiffs' employees would request an accommodation from their employer that conflicts with their employer's known beliefs. *See Tennessee v. EEOC*, ---F. Supp. 3d---, 2024 WL 3012823, at *4 (E.D. Ark. June 14, 2024) (finding it "particularly unlikely" that state employee would inform employer she "need[s] time off to get an illegal abortion"), *appeal filed*, No. 24-2249 (8th Cir. June 20, 2024); *Nat'l Conf. of Cath. Bishops*, 653 F.2d at 540 (precursor

---

[4] The Bishops describe their religious beliefs in terms of opposition to "direct abortion," defined as "abortion willed as an end or as a means," USCCB Compl. ¶¶ 80-82, 86, as well as to "contraception, direct sterilization, and artificial reproductive technologies," USCCB Br. at 6. The declarants for the Plaintiff States object to "elective abortions" that are illegal under state law. *See* 2d Keen-Schilling Decl. (*La.*, ECF No. 70-3) ¶ 6 (declaration for Louisiana discussing Final Rule's coverage of "purely elective abortions that would be illegal under Louisiana law"); 2d Hardwick Decl. (*La.*, ECF No. 70-4) ¶ 9 (same for Mississippi discussing accommodations "for the express purpose of obtaining an elective abortion that violates state law"). In this filing, Defendants' use of the word "abortion" is intended to mean the abortions that fit within the scope of Plaintiffs' objections, unless otherwise specified.

to USCCB lacked standing to challenge PDA's abortion coverage because employees were "likely to be aware of [Catholic] plaintiffs' opposition to abortions [and] they are unlikely, as a consequence of their awareness, to request such benefits"). And of course, in the improbable case that all of the necessary contingencies materialize, there are still several additional contingencies required before any government enforcement action could be filed against a Plaintiff. *See* Defs' Br. at 8.

Courts routinely reject theories of injury like Plaintiffs', which "rel[y] on a highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *see Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) ("The one-step-removed, anticipatory nature of [plaintiffs'] alleged injuries" fails to satisfy standing.); *Tennessee*, 2024 WL 3012823, at *4 (finding "[t]his many-step series of events [necessary for PWFA enforcement] is certainly possible, but it is not certainly impending"). That is particularly true when the theory "depends in large part on the actions of third[ ]part[ies]," *Zimmerman v. City of Austin*, 881 F.3d 378, 390 (5th Cir. 2018); *see Glass v. Paxton*, 900 F.3d 233, 240 (5th Cir. 2018), or illegal conduct, *see, e.g.*, *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974). It is undisputed that EEOC has never brought any PWFA enforcement action involving the matters to which Plaintiffs object, so Plaintiffs are unable to point to any evidence at all in support of their vague, unsubstantiated assertions that the speculative prospect of enforcement action is sufficient to support their standing. *See* Lage Decl. (*USCCB*, ECF No. 75-3) ¶¶ 4-5; 2d Lage Decl. ¶ 4. Plaintiffs here have failed to identify even one situation in which an employee has *ever* sought an accommodation or leave in the circumstances that Plaintiffs are challenging. This is notwithstanding that the PWFA has been in effect for well over a year; the Final Rule, in large part, since mid-June 2024; and Title VII for decades.[5]

Plaintiffs have not identified any concrete injury that is "certainly impending" sufficient to

---

[5] To the extent the Bishops bring religion-related claims based on Title VII, they lack standing based on a similar chain of speculative contingencies that would all have to arise before any Title VII enforcement action could be brought. Indeed, another court determined that the predecessor-entity to the USCCB—which conceded that Title VII encompasses abortion—lacked standing to challenge it. *See Nat'l Conf. of Cath. Bishops*, 653 F.2d at 539-41. A half century later, the Bishops still have not identified any employee who has ever requested time off for an abortion under Title VII. Thus, the Bishops do not establish imminent injury based on Title VII or EEOC's understanding of its express language.

support their Article III standing to sue. *Clapper*, 568 U.S. at 410.

**B.    Plaintiffs' Theories of Injury Fail for Additional Reasons**

**1.    Compliance Costs Do Not Establish Standing**

Given Plaintiffs' failure to show at summary judgment, with concrete and specific facts in the record, that any of their employees will request a challenged accommodation, and that Plaintiffs will experience any harm in the wake of such a request, Plaintiffs cannot demonstrate standing based on purported costs they might incur to address that hypothetical scenario. *See Murthy*, 144 S. Ct. at 1995; *Clapper*, 568 U.S. at 416; *Lake Carriers' Ass'n*, 406 U.S. at 507; *Tennessee*, 2024 WL 3012823, at *6. Moreover, even apart from that fundamental defect, the factual record regarding these costs is independently lacking.

The States claim they will incur "training costs, legal expenses, administrative costs, and productivity losses" if they are "forced to change their accommodations policies or else face enforcement actions." Sts. Br. at 10-11. As an initial matter, the Final Rule does not require employers to maintain or provide employees with a formal policy describing their rights to abortion-related accommodations. *See, e.g.*, 2d Schober Decl. ¶¶ 15-16 (describing purported costs associated with drafting and printing new policy). Any claimed injury associated with preparing such a policy therefore does not extend from the Final Rule and is not cognizable. *See Clapper*, 568 U.S. at 418 (self-inflicted injuries do not support standing). This is especially true given that the Plaintiff States have not identified any employment policy prohibiting abortion-related accommodations that they claim must now be changed. Indeed, Louisiana's Civil Service Rules and Mississippi's State Employee Handbook are publicly available, and neither contains any policies related to abortion.[6]

More broadly, however, these costs, and those identified at the preliminary injunction stage, *see* PI Order at 9, do not stem from the challenged aspects of the Final Rule; they are alleged "implementation cost[s] of altering the current policy *to comply with the Final Rule*" *as a whole*. 2d Schober Decl. ¶ 18 (emphasis added). This means that even if the States could plausibly allege that the Final

---

[6] *See generally*, La. St. Civil Serv., Civil Service Rules (Jan. 1, 2024), https://perma.cc/6BBU-74A9; Miss. St. Pers. Bd., Miss. State Employee Handbook (July 1, 2024), https://perma.cc/9E6A-9H4B.

Rule leads them to undertake costs, such as costs associated with updating policies and training staff on the PWFA and Final Rule, those costs would be attributable to the PWFA and Final Rule regardless of the challenged provisions. They would also undertake those costs as to reasonable accommodations for abortions that they concede are lawful, *see* 2d Hardwick Decl. ¶ 6; 2d Keen-Schilling Decl. ¶ 6. Indeed, Plaintiff States already provide leave benefits to their employees and employ human resources staff to administer them. *See, e.g.*, Schober Decl. (*La.*, ECF No. 17-2) ¶¶ 12, 16; 2d Hardwick Decl. ¶¶ 8-10; SMF ¶¶ 9-10. They do not claim any additional costs based on a supposed inability of existing staff to implement the Final Rule (including its abortion-related provisions) consistent with their normal duties, which presumably include administering numerous similar laws. The same issue results from the estimated one-time administrative costs. *See* PI Order at 9 (citing 89 Fed. Reg. 29,177). Even if Plaintiffs incurred those costs, they would do so under the PWFA and Final Rule regardless of the challenged aspects of the Final Rule.

Finally, to the extent the States seek to rely on costs that can only materialize if any employee is actually granted an abortion-related accommodation or files a charge, *see, e.g.*, 2d Schober Decl. ¶¶ 16-17 (asserting potential costs of "processing requested accommodations"; "[c]overing for employee's absences; "[p]aying overtime costs for shift-covering"; and "[a]nswering, responding, litigating, or otherwise defending against charges" or "lawsuits"[7]); 2d Hardwick Decl. ¶ 10 (asserting potential costs of "lost productivity"; "overtime pay for shift-covering"; and "hiring interim employees, depending on the length of leave"), such costs are entirely hypothetical for the reasons discussed above and cannot establish an injury-in-fact. *See supra* § I.A. This is underscored by the fact that the States have not provided any evidence that they have actually incurred such costs.

Thus, the States cannot claim injury from the narrow portion of the Final Rule that they challenge. *See Tennessee*, 2024 WL 3012823, at *6.

As to the Bishop Plaintiffs, to the extent certain entities have suggested costs that they may incur such as developing new policies, *see* 3d Caraway Decl. ¶ 21; 3d Ridderhoff Decl. ¶ 39*; but see* 2d

---

[7] As described *infra*, alleged costs of defending against "lawsuits by DOJ, and private actions by allegedly aggrieved individuals," 2d Schober Decl. ¶ 17, do not support standing against EEOC.

Brown Decl. (alleging no compliance costs for CUA); 2d Fontenont Decl. (*USCCB*, ECF No. 77-7) (same re Diocese of Lafayette), those alleged costs would likewise extend from the Final Rule and PWFA regardless of the narrow provisions to which they object, and the Bishops do not claim that current staff are unable to handle implementation with existing resources. *See* 3d Ridderhoff Decl. ¶ 39; 3d Caraway Decl. ¶ 21. And any hypothetical costs associated with "legal fees" for "consultations with outside counsel about complying with" the Final Rule, 3d Caraway Decl. ¶ 22; 3d Ridderhoff Decl. ¶ 40, those conclusory assertions are insufficient and, at best, reflect self-inflicted injury that cannot support Article III standing. Finding standing on such a theory would also enable anyone to manufacture standing simply by consulting with a lawyer. That is not the law. *See Clapper*, 568 U.S. at 402 ("respondents cannot manufacture standing by choosing to make expenditures based on hypothetical future harm"); *cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). And USCCB and Lake Charles Diocese have not established why, as entities already subject to laws like Title VII[8] or the Louisiana PDA, they are not already aware of their obligations and defenses. *See* 89 Fed. Reg. at 29,160.

### 2. The Final Rule Does Not Interfere with Any State Policy

The States also claim that the Final Rule "coerces the States to change their stance" because they generally maintain a "pro-life policy." Sts. Br. at 10, 12; *see also* PI Order at 11 (finding likely standing based on "undermin[ing] their sovereignty and the democratic process"). As the States now recognize, *see* Sts. Br. at 12, no State law actually conflicts with the Final Rule. *See* 89 Fed. Reg. at 29,104 (PWFA "does not regulate the provision of abortion services or affect whether and under what circumstances an abortion should be permitted."). The Final Rule similarly does not conflict with the States' alleged "pro-life policy." Sts. Br. at 12; *see, e.g.*, 89 Fed. Reg. at 29,109 ("[T]his rulemaking does not require abortions or affect the availability of abortion; it simply ensures that employees who choose to have (or not to have) an abortion are able to continue participating in the workforce[.]"); *id.* at 29,111 ("nor does it require an employer to pay for, promote, or endorse abortion"). More

---

[8] The Bishop Plaintiffs have not asserted any compliance costs associated with Title VII.

fundamentally, where the Supreme Court has recognized a sovereign interest of the sort Plaintiffs posit, it has arisen from the "power to create and enforce a legal code." *Alfred L. Snapp & Son, Inc. v. P.R., ex rel., Barez*, 458 U.S. 592, 601 (1982). Plaintiffs identify no case supporting the boundless principle that a purported federal-law conflict with a non-enforceable, generalized statement of state policy can establish injury. *See Va. ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 271 (4th Cir. 2011) (holding that Virginia could not establish standing to challenge federal requirements based on an asserted conflict with a state law that "does nothing more than announce an unenforceable policy goal"); *Tennessee*, 2024 WL 3012823, at *7 ("non-binding policy declarations are not themselves enforceable" and do not show "harm to their power to create and enforce a legal code" (cleaned up)). Thus, the States cannot establish an Article III injury on this basis.

### 3. The States Have Not Demonstrated Any Speech Injury

Finally, the States do not even attempt to argue that their purported speech harms establish standing. That is for good reason. The States have not identified any "messaging" they currently engage in, or imminently wish to engage in, that is proscribed. *See Zimmerman*, 881 F.3d at 388; *Murthy*, 144 S. Ct. at 1996); *supra* n.6 (state employee handbooks containing no messaging regarding abortion). Nor can Plaintiffs rely on State laws as embodying abstract "messages" to engineer a purported conflict with federal policies; such a theory would eviscerate limits on Article III standing. *See United States v. Texas*, 599 U.S. 670, 680 n.3 (2023).

### C. Plaintiffs Have Not Proven Their Injuries Are Redressable

Plaintiffs also have not established that their alleged injuries are redressable through this action.

First, all of Plaintiffs' claimed injuries stem from the purported legal obligations that they claim the Final Rule imposes on them, *i.e.*, to extend accommodations to which they object. That legal obligation, Plaintiffs say, requires them to take various steps like incur compliance costs. But Plaintiffs wholly ignore that, even if this Court enters Plaintiffs' requested relief, private individuals would remain free to bring suit against Plaintiffs and argue that Plaintiffs are under the exact same legal obligations as a result of the PWFA itself. Any relief entered in this case could not properly preclude private individuals from enforcing the protections of the PWFA. *See Tennessee*, 2024 WL 3012823, at

14

*4 ("Pausing all or part of the [PWFA] regulation or its enforcement will not . . . prevent an aggrieved employee from filing such a charge, or trying to file one, or eventually asking a court" to enforce "the Act itself [as] requir[ing] State employers to accommodate elective abortions[.]"); *Texas v. Garland*, 719 F. Supp. 3d 521, 598 (N.D. Tex. 2024) (acknowledging, in challenge to PWFA as a whole, that relief could not "prevent [a private party] from filing her own PWFA lawsuit against Texas."), *appeal filed*, No. 24-10386 (5th Cir. May 1, 2024). Plaintiffs' declarations do not explain why their claimed harms (*e.g.*, compliance costs) would not still occur as a result of the legal obligations threatened by private lawsuits. And to the extent the threat of private lawsuits is not enough to motivate Plaintiffs to incur compliance costs or change their alleged policies—perhaps because Plaintiffs view such lawsuits as inherently speculative—Plaintiffs' declarations do not explain why the hypothetical prospect of governmental enforcement is any different and *would* cause their purported injuries. Thus, the availability of private enforcement highlights that these speculative, hypothetical injuries are not redressable in this suit. *See Murthy*, 144 S. Ct. at 1993 ("redressability problem" where non-parties remain "free to" take allegedly injurious action); *Okpalobi v. Foster*, 244 F.3d 405, 427 (5th Cir. 2001) (en banc) (no standing because "defendants have no authority to prevent a private plaintiff from invoking the statute in a civil suit").

Second, Plaintiffs have not established that their injuries are attributable to the Final Rule. *See, e.g.*, *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006) (no redressability where "unchallenged provisions" would still prohibit plaintiff's desired conduct). To the extent Plaintiffs offer leave benefits, including unpaid leave when the employee has exhausted other available leave, *see, e.g.*, 2d Hardwick Decl. ¶ 8; 2d Schober Decl. ¶ 12; SMF ¶¶ 9-10; 3d Caraway Decl., Ex 2 at 52; 2d Brown Decl., Ex. 5 at 8; 3d Ridderhoff Decl., Ex. 2 at § IV, Title VII (subject to applicable defenses) requires them to offer those same benefits to employees affected by pregnancy, childbirth, or related medical conditions who are similar in their ability or inability to work, including leave regarding abortion. *See infra* § II.A. And Louisiana's PDA analogue requires the same. *See Ducharme v. Crescent City Deja Vu, L.L.C.*, 406 F. Supp. 3d 548, 557 (E.D. La. 2019).

Third, the State Plaintiffs' requested relief could not even address the purported and

hypothetical risk of enforcement action to which Plaintiffs gesture. Under the statute, federal enforcement actions against States can be filed only by DOJ, which is not a defendant. *See* 42 U.S.C. §§ 2000gg-2(a)(1), 2000e-5(f)(1). DOJ retains authority to bring such enforcement actions under the statute, including based on a "pattern or practice" violation, which DOJ may initiate without EEOC involvement. *Id.* § 2000e-6.

Finally, the Plaintiff States lack standing to challenge the PWFA's abrogation of State sovereign immunity. The only defendant here is a federal agency that is not authorized to initiate enforcement actions against the States, and, in any event, State sovereign immunity does not apply to suits by the federal government. *See Alden v. Maine*, 527 U.S. 706, 755 (1999) (state sovereign immunity does not extend to suits "by the Federal Government"). Thus, the States cannot assert any injury attributable to the PWFA's abrogation of state sovereign immunity that is redressable by this action.

### D.    Plaintiffs' Claims Are Not Ripe Given Their Fact-Specific Nature

Even if Plaintiffs can overcome the above standing deficiencies, their claims are not ripe. *See Abbott Lab'ys. v. Gardner*, 387 U.S. 136, 148-49 (1967); *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967); Defs' Br. at 15-16. The factual record here confirms as much. There is no hardship to declining review at this time given the abstract, hypothetical nature of Plaintiffs' claimed injuries and unsubstantiated and nonspecific compliance costs that in any event are not attributable to the challenged aspect of the Final Rule. And Plaintiffs themselves confirm that they object only to specific types of accommodations, which underscores that it is necessary to examine the facts of each particular case to assess their claims. *See, e.g.*, USCCB Compl. ¶ 5 (objecting to "direct abortion"); USCCB Br. at 5-6, 28 (objecting only to "*knowingly* accommodat[ing]" the abortions they oppose (emphasis added)); 3d Ridderhoff Decl. ¶ 30 (objecting to fertility treatments that "the Catholic Church believes are immoral"); Sts. Br. at 16 (objecting to elective abortion). Because the specific circumstances of an individual employee's desired accommodation would be essential to know in assessing Plaintiffs' claims, including to evaluate whether Defendants believe the PWFA even requires such a requested accommodation, Plaintiffs' claims are not ripe.

## II.    THE FINAL RULE PROPERLY PROVIDES THAT EMPLOYEES MAY SEEK ACCOMMODATIONS FOR ABORTION

Plaintiffs challenge the Final Rule's inclusion of abortion.[9] Their arguments continue to ignore Title VII's text, which itself confirms that the phrase "pregnancy, childbirth, or related medical conditions" includes abortion. By using identical language in the PWFA, Congress made clear that accommodations under the PWFA can cover abortion too. The PWFA's text confirms this as well.

### A.    Title VII's Text Encompasses Employment Protections for Abortion, and Congress Used the Same Language in the PWFA

Plaintiffs continue to attack a straw-man version of Defendants' arguments, largely ignoring that the text of Title VII itself confirms that the phrase "pregnancy, childbirth, or related medical conditions" encompasses abortion. Specifically, the text of Title VII provides:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work[.] . . . This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion[.]

42 U.S.C. § 2000e(k). The first sentence quoted above prohibits discrimination on the basis of "pregnancy, childbirth, or related medical conditions." The second sentence then provides that this non-discrimination mandate does "not require an employer to pay for health insurance benefits for abortion," but then provides an exception to that general carve-out—*i.e.*, "*except where* the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion." *Id.* (emphasis added). That latter sentence—particularly its confirmation that employers *can* be required to pay for abortion in certain situations—necessarily means that abortion is subsumed within the first sentence's prohibition of discrimination based on

---

[9] While the Bishops raise religious-based objections to "contraception, direct sterilization, and artificial reproductive technologies," USCCB Br. at 6, they do not brief, and have thus waived, any APA claim as to the Final Rule's determination that the PWFA may require accommodations of such care in certain circumstances. *See Gann v. Fruehauf Corp.*, 52 F.3d 1320, 1328 (5th Cir. 1995) (arguments not briefed are waived).

"pregnancy, childbirth, or related medical conditions." The second sentence's "except where" clause would be non-sensical if, as the States suggest, that sentence were just another example of "Congress go[ing] out of its way to make clear that it is not mandating the funding of abortion[.]" Sts. Br. at 21.[10] That clause can only be understood as confirming that abortion falls within the preceding phrase "pregnancy, childbirth, or related medical conditions."

That understanding is consistent with the history of amendments to Title VII, Congress's expectations, as well as court decisions and administrative guidelines. Congress expressly understood that the PDA's "basic language covers decisions by women who cho[o]se to terminate their pregnancies." H.R. Conf. Rep. No. 95-1786, at 4 (EEOC_136023); H.R. Rep. No. 95-948, at 7 (EEOC_136008). *See also* H.R. Rep. No. 95-948, at 7 (EEOC_136008) (explaining that Congress added second sentence regarding payment for abortions to clarify that statute's general coverage of abortion does not mean "that an employer would have to pay for abortions not necessary to preserve the life of the mother."). Indeed, "Congress' express intent was to codify pre-*Gilbert* EEOC guidelines that required 'employers to treat disabilities caused or contributed to by pregnancy, miscarriage, abortion, childbirth and recovery therefrom as all other temporary disabilities.'" *Barnes v. Hewlett-Packard Co.*, 846 F. Supp. 442, 444-45 (D. Md. 1994) (quoting H.R. Rep. No. 95-948, at 2 (EEOC_136003)), and *Wallace v. Pyro Mining Co.*, 789 F. Supp. 867, 869 (W.D. Ky. 1990), *aff'd* 951 F.2d 351 (6th Cir. 1991)). Far from being "self-serving," Sts. Br. at 20, EEOC's Title VII guidance is particularly persuasive because it encompasses abortion similarly to the pre-PDA guidance that Congress specifically sought to re-codify.[11] Unsurprisingly then, *every court* to have considered the issue

---

[10] The States further attempt to paint this economic restriction as demonstrating that Title VII does not extend to "*purely elective* abortions." Sts. Br. at 21 n.11. But it only applies such restriction to *paying* for abortions; the statute otherwise broadly covers abortion, regardless of its reason. *See, e.g., Nat'l Conf. of Cath. Bishops*, 653 F.2d at 538 n.2 (PDA coverage of "sick leave benefits . . . would include elective or optional abortions" but "it would not require an employer to pay health insurance costs for abortions, except [where medical exceptions apply].");  *Ducharme*, 406 F. Supp. 3d at 557 (interpreting Louisiana's PDA analogue to apply conterminously with the PDA to "termination of a pregnancy, whether medically necessary or not").

[11] The Bishops' only other retort is to suggest that EEOC has not enforced this understanding of Title VII. *See* USCCB Br. at 12. To the contrary, EEOC has brought multiple actions to "protect

has determined that Title VII encompasses abortion. *See* Defs' Br. at 18 (collecting cases). Plaintiffs have no plausible argument that Congress intended the phrase "pregnancy, childbirth, or related medical conditions" as used in the PWFA to have a different meaning than the identical phrase as used in Title VII. Such an argument is particularly illogical given that, as even Plaintiffs acknowledge, the PWFA was intended to *expand* the protections afforded by Title VII. *See* Sts.' Br. at 2; USCCB Br. at 2. Such an interpretation would violate several canons of statutory construction. *See George v. McDonough*, 596 U.S. 740, 746 (2022) ("Where Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it."); *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) ("[W]hen Congress uses the same language in two statutes having similar purposes . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."); 89 Fed. Reg. at 29,104-08.

Plaintiffs attempt to dismiss the settled meaning of the identical language in Title VII by characterizing Title VII as an anti-discrimination law, and the PWFA as an "accommodation" law. *See* Sts. Br. at 12; USCCB Br. at 12. But that characterization does not overcome that Congress borrowed the exact language and its settled meaning from Title VII in enacting the PWFA, "bring[ing] the old soil with it." *George*, 596 U.S. at 746. And in any event, accommodation law is a species of anti-discrimination law, *e.g., US Airways, Inc. v. Barnett*, 535 U.S. 391, 396 (2002) (recognizing ADA defines "discrimination" to include "*not making reasonable accommodations*" (citation omitted)), as Congress itself understood in characterizing the PWFA, *see* 42 U.S.C. § 2000gg-1 ("*Nondiscrimination* with regard to reasonable accommodations related to pregnancy" (emphasis added)); *see also* Sts. Br. at 3 ("PWFA-prohibited discrimination include[s] . . . refusing to provide reasonable accommodations"). As the Bishops argue, "[t]ext should never be divorced from context," USCCB at 12 (citation omitted), and the context here—that the PWFA was passed to fill gaps in the PDA, *e.g.*, Sts. Br. at 12, using the same relevant language as the PDA—supports that the PWFA should be interpreted to afford at least the

---

employees who are being harassed about their decision not to have an abortion and [to] protect the religious views of employees who oppose abortion." 89 Fed. Reg. at 29,154-55 & n.313 (collecting cases).

same scope of coverage.

Next, the Bishops claim that the Title VII language is broader than the PWFA because it contains the phrase "*include, but are not limited to*." USCCB Br. at 13. The PWFA, however, also contains broad language. *See* 42 U.S.C. § 2000gg(4) ("related to, affected by, or arising out"). And more to the point, this phrase in the PDA merely "emphasizes that Title VII[] . . . is not restricted solely to discrimination on the basis of 'pregnancy, childbirth, or related medical conditions,'" but covers other forms of sex discrimination as well. *In re Union Pac. R.R. Emp. Pracs. Litig.*, 479 F.3d 936, 942 n.2 (8th Cir. 2007) (citation omitted). For the same reason, Congress could not have incorporated the protections of Title VII by cross-reference, *see* Sts. Br. at 21-22; USCCB Br. at 13, as that would have incorporated Title VII's sex-based protections unrelated to pregnancy, which are beyond the PWFA's intended scope. Such incorporation would also have continued to require a showing of differential treatment to obtain an accommodation, which was the very reason Congress sought to enact the PWFA to *remove* such a requirement. *See, e.g.*, H.R. Rep. No. 117-27, at 14-17 (EEOC_136674-77). Moreover, where Congress specifically incorporated by reference certain definitions, those terms are used in multiple statutes "and some of their definitions vary across statutes." 89 Fed. Reg. 29,108. "By contrast, there is only one other statute that [EEOC] enforces that uses the phrase 'pregnancy, childbirth, or related medical conditions,'" and thus "Congress' intent to use the Title VII definition in the PWFA is clear." *Id.*

Finally, that the relevant language in Title VII pre-dates *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), is irrelevant to the statutory analysis. Title VII's coverage of abortion is a statutory, not constitutional, protection and the settled meaning of the statutory language was never dependent on the reasoning relevant to *Dobbs* and has not changed, *see Clark v. Martinez*, 543 U.S. 371, 382 (2005).[12] Title VII's text itself confirms that the phrase "pregnancy, childbirth, or related medical conditions" covers abortion and Congress's decision to use the identical phrase in the PWFA means

---

[12] While the Bishop Plaintiffs seek as-applied relief as to Title VII to the extent it implicates "the Bishops' religious employment policies or practices," *USCCB*, ECF No. 77 ("USCCB Mot.") at ¶¶ 6, 7, they do not brief, and thus waive, any claim that Title VII itself does not encompass abortion. *See Gann*, 52 F.3d at 1328.

that the PWFA does too.

### B.    The Text of the PWFA Itself Covers Abortions

As noted, Plaintiffs largely ignore the foregoing Title VII textual analysis, and instead seek to interpret the text of the PWFA divorced from the relevant statutory scheme and context. Plaintiffs' efforts are unavailing because, even on its own terms, the text of the PWFA confirms that it encompasses abortion-related accommodations.

The PWFA requires the reasonable accommodation (absent undue hardship or other exception) of a "known limitation"—a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg(4). Abortion—which can only be performed on account of pregnancy—is inherently "related to" and "arising out of pregnancy . . . or related medical conditions." *Id.*; *see, e.g.*, *In re Union Pac.*, 479 F.3d at 942 ("[A]bortion arguably would be 'related to' pregnancy . . . because abortion can only occur when a woman is pregnant."); *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008) ("[T]he term "related medical conditions" includes an abortion."). As the Final Rule explains, "pregnancy" includes "past pregnancy," 89 Fed. Reg. 29,183; *see also EEOC v. Hous. Funding II, Ltd.*, 717 F.3d 425, 430 (5th Cir. 2013) (recognizing post-pregnancy conditions are covered by PDA). Therefore, to the extent a woman experiences physical conditions, like cramping or nausea, after an abortion, those physical conditions arise of out and relate to (past) pregnancy and fall within the PWFA. For similar reasons, those physical conditions constitute "related medical conditions" to pregnancy, even under Plaintiffs' proffered definitions.[13] *See* USCCB Br. at 9 ("'medical' generally references the diagnosis and treatment of disease and the maintenance of health"; "'condition' is a state of health or physical fitness or illness or other medical problem" (cleaned up); Sts. Br. at 15 (similar); *see Hous. Funding II, Ltd.*, 717 F.3d at 428 (terms

---

[13] To the extent Plaintiffs suggest that abortion can only fall within the "related medical conditions" portion of the PWFA, *see* USCCB Br. at 8-9, they misread the Final Rule. While the Final Rule recognizes that abortion can fall within "related medical conditions," *see* 89 Fed. Reg. at 29,191, it also repeatedly emphasizes that, more broadly, "abortion is encompassed within the phrase 'pregnancy, childbirth, or related medical conditions.'" *Id.* at 29,109; *see also e.g.*, *id.* ("abortion would be covered as a pregnancy-related condition"); *id.* at 29,104-06.

"broadly construe[d]").[14]

To escape this statutory language, Plaintiffs primarily argue that abortion is a "procedure" not a "condition." *See* USCCB Br. at 9; Sts. Br. at 15. Again, because abortion is inherently "related to" and "arising out of pregnancy . . . or related medical conditions," the physical, mental, or medical conditions associated with it are squarely within the scope of the statute, regardless of what term one uses to refer to the abortion itself. This coheres with the PWFA framework, which identifies the known limitation on a more granular level than the procedure, since the nature of the limitation—not the procedure—informs the accommodation needed. For example, the accommodation for physical unavailability while obtaining or recovering from a procedure is typically leave, while the accommodation for post-procedure discomfort may be additional breaks.

Plaintiffs also attempt to read into the statute an array of restrictions, none of which exists in text. *Compare* USCCB Br. at 8 (arguing abortion does not "treat a medical condition related to pregnancy" (cleaned up)) *with* 42 U.S.C. § 2000gg(4) (containing no treatment requirement); USCCB Br. at 9 (suggesting statute covers non-childbirth pregnancy outcomes only if "related to the *nonviable* pregnancy" (emphasis added)); *with* 42 U.S.C. § 2000gg(4) (covering conditions "related to pregnancy," regardless of viability); Sts. Br. at 16 (suggesting statute only cover "medical conditions"); *with* 42 U.S.C. § 2000gg(4) (covering "physical or mental condition[s]"). Indeed, many of these interpretations would exclude undisputedly covered care, like amniocentesis, which may be "elective procedures" and performed absent any treatment purpose or "medical condition" beyond pregnancy itself.

Plaintiffs similarly resort to the *ejusdem generis* canon to argue that because "pregnancy" and "childbirth" "expressly aim toward the healthy and safe birth of a child," the term "related medical conditions" cannot be read "to cover a pregnancy-ending . . . procedure." Sts. Br. at 17; *see* USCCB

---

[14] The States suggest that EEOC acted nefariously in not consulting the dictionary definition of the word "condition" in the Final Rule, despite considering the definition of terms like "related to" "affect" and "arise," Sts. Br. at 18 (citation omitted), which appear in the PWFA's definition of "known limitation," 42 U.S.C. § 2000gg(4). The States offer no reason why EEOC's reference to a dictionary for five words within the overall statutory scheme impugns the agency's interpretation of other words—particularly nouns that have a clear meaning. As just explained, even adopting Plaintiffs' preferred definition, the PWFA covers conditions related to abortion. *See also* Defs' Br. at 19-20.

Br. at 11. But the statute broadly covers all conditions "related to, affected by, or arising out of pregnancy [or] childbirth." 42 U.S.C. § 2000gg(4). Plaintiffs do not dispute that an abortion "aris[es] out of pregnancy," *id.*, which by itself highlights that the natural meaning of the statutory language encompasses abortion (and thus requires accommodation for the known limitations associated with an abortion).

In attempting to distinguish stillbirth and miscarriage from abortion, the Bishops assert that that the former "relate to, are affected by, or arise out of the unviable pregnancy itself," and "are often accompanied by physical or mental conditions that may require treatment," USCCB Br. at 9 (cleaned up). But again, nothing in the PWFA's text requires that a known limitation be involuntary or naturally occurring, as opposed to the product of "a voluntary external procedure" arising out of the pregnancy. *Id.* And this same interpretation highlights why abortion is covered—the abortion "relate[s] to" and "arise[s] out of" the "pregnancy itself," and sometimes may be "accompanied by physical or mental conditions that may require treatment" or other accommodations, *id.*—just like any other procedure arising out of the pregnancy, such as an ultrasound.

Finally, the Bishops argue that *all* abortions are excluded from the scope of the PWFA, including those performed to treat a pregnancy-related medical condition or complication. *See id.* at 10 (arguing that "abortion remains a 'procedure,' regardless of why it is performed," and because "abortion is a procedure, then the PWFA is not implicated"); *see also* 2d Kunkel Decl. (*USCCB*, ECF No. 77-3) ¶ 20 ("This prohibition on abortion—meaning the direct taking of the child's life—extends to situations in which the mother faces serious or grave illness during pregnancy."). But even the States do not dispute that these medically necessary abortions are covered by the PWFA. *See, e.g.*, Sts. Br. at 16. Under the Bishops' reading, the PWFA would not cover accommodations for *any* termination procedures, even when performed on a woman with a serious health condition like preeclampsia—despite the presence of a "physiological state" that "may require treatment" (in some cases termination), USCCB Br. at 9. So too of other pregnancy-related conditions, like preterm premature rupture of membranes and placental abruption, which constitute "related medical conditions" and, in

some cases, may be treated with abortion.[15] *See* 89 Fed. Reg. at 29,183. The plain text of the PWFA encompasses abortion, and at an absolute minimum encompasses medically necessary abortions, as even the States concede and as this Court previously concluded. *See* PI Order at 31 n.16.

### C.    Materials Outside the PWFA's Text Do Not Change the Analysis

The above textual analysis is not undermined by Plaintiffs' reliance on extra-textual materials. While Plaintiffs claim the legislative history "unambiguously" confirms Congress's intent to exclude abortion, Sts. Br. at 23-24; USCCB Br. at 11, the record contains ample evidence that many Members understood it quite differently. *See, e.g.*, H.R. Rep. No. 117-27, at 60 (EEOC_136720) (stating in Minority Report that the statute "could require [an] organization to comply with" a request for "time off to have an abortion procedure . . . as a reasonable accommodation"); 167 Cong. Rec. H2226, H2228-29 (daily ed. May 12, 2021) (statement of Rep. Taylor Greene declining to support PWFA because it covers abortions); 167 Cong. Rec. H2321, H2325 (daily ed. May 14, 2021) (EEOC_136727) (statement of Rep. Letlow expressing same). Additionally, 25 Senators and 83 House of Representatives Members signed Comments endorsing the Final Rule's coverage of abortion. *See* EEOC_134582; EEOC_133187-88. So too did Senate Sponsor Bob Casey, who recognized that "'pregnancy, childbirth, and related medical conditions,' . . . has been previously defined to include . . . abortion." EEOC_134179.

Other statutory restrictions on abortion also do not evince any intent to exclude abortion in the PWFA. *Contra* Sts. Br. at 21. If anything, explicit restrictions on abortion in the States' cited statutes and elsewhere in the Consolidated Appropriations Act in which the PWFA was enacted confirm that

---

[15] Indeed, a termination procedure performed when a woman is suffering an ectopic pregnancy falls squarely within the Bishops' own proffered reading of the statute: ectopic pregnancies "relate to, are affected by, or arise out of the unviable pregnancy itself" and "are often accompanied by physical or mental conditions" (e.g. hemorrhage, infection) "that . . . require treatment" (in some cases, termination), USCCB Br. at 9 (cleaned up). The Bishops respond to the example of ectopic pregnancies by saying that they do not consider one particular form of treatment—*i.e.*, "removing a fallopian tube"—to be a direct abortion under their understanding of the term. *Id.* at 10. But removing a fallopian tube, which could have permanent ramifications for a woman's fertility, may not be the best treatment for every patient, and only further highlights that the Bishops' view of what is covered by the PWFA is unmoored from its text.

24

when Congress wishes to exclude abortion, it says so explicitly. *See Keene Corp. v. United States*, 508 U.S. 200, 208 (1993). And Congress did specify a limit on the PWFA's applicability to abortion: like the PDA, the PWFA does not "require an employer-sponsored health plan to pay for or cover" abortion. 42 U.S.C. § 2000gg-5(a)(2); *see* 42 U.S.C. § 2000e(k).

Finally, there is no basis to invoke the major questions doctrine. EEOC was not exercising discretion in deciding abortion is covered by the PWFA; it was enforcing "policy decisions" made by "Congress itself" in adopting language with a well-established meaning. *West Virginia v. EPA*, 597 U.S. 697, 723, 735 (2022) (doctrine applies to agency interpretations of "ambiguous statutory text" (citations omitted)). This Court applied the major questions doctrine at the preliminary injunction stage because "abortion has been one of the most important social, religious, and political issues of our time and is a major issue in every federal election." PI Order at 21. Whatever controversy may exist as to abortion generally, however, does not establish that there is significant controversy over the specific issue addressed by the PWFA—*i.e.*, whether women who need reasonable accommodations in the workplace in connection with an abortion can be denied those accommodations or otherwise disciplined for needing one. Simply having some tangential connection to a hot-button or politically controversial topic is not enough to fall within the doctrine. *See West Virginia*, 597 U.S. at 723 (doctrine applies only in "extraordinary cases"); *Tennessee*, 2024 WL 3012823, at *8 ("[T]he Supreme Court has not said that something is a 'major question' simply because it involves a particularly controversial topic."). EEOC did not "claim[] to discover in a long-extant statute an unheralded power" that had "rarely been used in the preceding decades," engage in a "radical or fundamental change to a statutory scheme," or "adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself." *West Virginia*, 597 U.S. at 723-24 (citations omitted). Rather, the Final Rule recognizes that Title VII's longstanding coverage of abortion applies to a similar statute containing identical language and intended to expand Title VII's protections. The Final Rule does not "resolve a matter of great political significance, . . . or end an earnest and profound debate across the country," *id.* at 743 (Gorsuch, J., concurring) (citations omitted). It recognizes that there may be religious or other exceptions to accommodations, protects employees who choose to have *or not to have* an abortion, and

does "not prescribe when, where, or under what circumstances an abortion can be obtained." 89 Fed. Reg. at 29,106; 29,112; 29,141.

The Bishops' request to extend the major questions doctrine to rules that implicate "religious exercise" is likewise unfounded. *See* USCCB Br. at 14. By that logic, any plaintiff could invoke the doctrine merely by claiming that a rule implicates their religious beliefs. *Contra West Virginia*, 597 U.S. at 723. And it is particularly inapt here, where the Final Rule does not impose any concrete obligations on religious entities and recognizes that they maintain their RFRA, constitutional, and other defenses. 89 Fed. Reg. 29,148-53. The Bishops' citation to cases invoking the doctrine in situations that implicate concerns like "separation of powers" and "federalism," USCCB Br. at 15-16, are inapposite to a generally applicable rule that does not facially implicate structural constitutional principles and provides mechanisms to address individual religious concerns should they arise, *see* 89 Fed. Reg. 29,148-53. The doctrine is therefore inapplicable.

## III.    THE STATES' REMAINING CLAIMS LACK MERIT

The States "only briefly address their remaining Counts," as "the Court need not spend significant time on the[m]." Sts. Br. at 25. Indeed, each of these claims fails for obvious legal deficiencies, whether addressed on the merits or under arbitrary and capricious review. *See id.* at 28.

### A.    The PWFA Validly Abrogates State Sovereign Immunity

As discussed above, the States lack standing to challenge the abrogation of sovereign immunity in this suit. Nothing in the factual record explains how resolution of that issue would affect their concrete legal interests, particularly given that any enforcement action brought by a federal agency would not need to rely on any abrogation of sovereign immunity.  The claim also fails on the merits.

The States' challenge to the PWFA's state sovereign immunity abrogation relies on two key errors. First, their claim that "Congress's Section 5 power . . . extends only to enforcing the provisions of the Fourteenth Amendment," and therefore cannot cover abortion, *id.* at 25 (cleaned up), is belied by Supreme Court precedent. Congress has "broad power . . . to remedy and to deter violation of rights guaranteed by the Fourteenth Amendment," including by enacting "prophylactic legislation that proscribes facially constitutional conduct." *Tennessee v. Lane*, 541 U.S. 509, 518 (2004) (cleaned up); *see*

*City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) ("Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power[,] even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'" (quoting *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455 (1976)). Second, the States claim that the abortion-related provisions are not congruent and proportional because there is no evidence "that Congress identified a problematic pattern of unconstitutional violations regarding abortion[.]" Sts. Br. at 26. But the proper inquiry is whether the accommodation obligation, *on the whole*, appropriately serves the problem Congress sought to address. *See, e.g., City of Boerne*, 521 U.S. at 532-33 (considering whether RFRA, as a whole, is "proportion[al] to a supposed remedial or preventive object"); *Maitland v. Univ. of Minn.*, 260 F.3d 959, 963, 965 & n.5 (8th Cir. 2001) (declining to individually "review . . . the 'proportionality and congruity' of remedies"). While Congress must "ha[ve] evidence of a pattern of constitutional violations on the part of the States," *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 729 (2003), it has never been required to identify a pattern of state discrimination for every *remedy* offered under a statute. *Cf. Katzenbach v. Morgan*, 384 U.S. 641, 654 n.15 (1996) (upholding abrogation in Voting Rights Act's prohibition on English literacy requirements even though most states did not maintain literacy requirements); *Maitland*, 260 F.3d at 965 & n.5.

The States do not dispute that the PWFA's abrogation of sovereign immunity is generally valid. Nor could they. The Court has repeatedly upheld laws that, like the PWFA, target workplace sex discrimination. *E.g., Fitzpatrick*, 427 U.S. 445; *Hibbs*, 538 U.S. 721 In enacting the PWFA, Congress received testimony about this continuing problem, *see, e.g.*, 167 Cong. Rec. H2331, H2338 (EEOC_136740), including findings regarding "state employers [who] continue to participate in and foster unconstitutional sex discrimination, including gender-role stereotyping," *id.*; *see id.* at H2338-39 (EEOC_136740-41). For these reasons and those discussed in Defendants' motion, *see* Defs' Br. at 22-24, the abrogation is valid.

### B.    The Final Rule Does Not Violate the Plaintiff States' Free Speech Rights

The Plaintiff States claim that the Final Rule violates their free speech rights. Sts. Br. at 26. As discussed previously, Plaintiff States have no First Amendment rights to invoke. *See, e.g.*, PI Order at

25 (recognizing that "the First Amendment does not confer rights on States"); Defs' Br. at 26 (collecting cases). Despite their Complaint expressly invoking rights under the First Amendment, *see* La. Compl. ¶ 64, they now try to recharacterize this claim as being rooted in a more general right for the State to speak for itself. Sts. Br. at 26-27. Regardless of the precise source of their rights, there is no precedent for allowing States to bring affirmative claims against the United States arguing that a federal policy is unlawful solely because it is contrary to the States' preferred "messaging." *See La.*, ECF No. 55 at 7-8.

In any event, the States' claim fails. The States have not identified any speech proscribed by the Final Rule that they currently, or imminently will, engage in, *see Zimmerman*, 881 F.3d at 388; *supra* § I.B.3, and they remain free to express general anti-abortion views under the Final Rule, *see* 89 Fed. Reg. at 29,148. Nor does the Final Rule force the States to speak, *id.* at 29,152, as there is nothing "inherently expressive" about an employer granting a reasonable accommodation, *Rumsfeld v. Forum for Acad. & Institutional Rts. Inc.* ("*FAIR*"), 547 U.S. 47, 66 (2006); *see id.* at 62 (It is not an "abridgment of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part . . . carried out by means of language[.]"); *id.* at 60 ("[The challenged policy] regulates conduct, not speech. It affects what [employers] must *do* . . . not what they may or may not *say*."); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 571-72 (1995) ("public accommodations statutes" that "prohibit[] discrimination" "do not, as a general matter, violate the First . . . Amendment[]"). So too of provisions related to retaliation and coercion, which "target conduct." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 757 (8th Cir. 2019). These provisions do not curtail the States' ability to "control their own messaging" about abortion, Sts. Br. at 27, as making "general statements regarding an employer's mission or religious beliefs," including about abortion, is not prohibited. 89 Fed. Reg. at 29,148. Indeed, the PWFA's anti-retaliation and anti-coercion provisions are the same as those in Title VII and the ADA, respectively, with which employers have complied for decades without First Amendment concerns. *Id.* 29,148; 29,152.

As to the States' "arbitrary and capricious" claim, *see* Sts. Br. at 27-28, EEOC extensively reviewed and responded to comments raising potential First Amendment concerns. *See, e.g.*, 89 Fed.

Reg. at 29,144-53; 29,148. EEOC also committed to considering First Amendment defenses on a case-by-case basis and to facilitating employers' ability to raise such defenses. *Id.* at 29,147-48; 29,151-52. Such an approach is far from irrational, especially for sensitive, fact-bound situations involving issues of speech. *Cf. Nat'l Lab. Rels. Bd. v. Bell Aerospace Co., Div. of Textron Inc.*, 416 U.S. 267, 294 (1974) ("[T]he choice between rulemaking and adjudication lies in the first instance within the [agency's] discretion.").

### C.     The Final Rule Does Not Improperly Infringe on State Sovereignty

The States claim that the Final Rule improperly concluded that it lacks "federalism implications" and committed to resolving any "interaction or conflict between PWFA and State laws . . . on a case-by-case basis." Sts. Br. at 28 (cleaned up). As discussed *supra* § I.B.2, the Final Rule does not conflict with any State law or require States to "promote, or endorse abortion," 89 Fed. Reg 29,111. EEOC also rationally responded to comments on these issues:

> [EEOC] does not agree . . . [that the Rule] requires covered entities, including State and local governments, to violate State laws that limit access to abortion, nor does the rule transgress limits of federalism. The rule does not prescribe when, where, or under what circumstances an abortion can be obtained or what procedures may be used.

89 Fed. Reg. at 29,112. EEOC further supported its conclusion by noting that despite Title VII covering abortion "for nearly 45 years . . . comments on this topic did not point to a situation where a State was forced to violate its own laws." *Id.* at 29,113. And, "[t]o the extent any such issues arise in connection with the PWFA," EEOC committed to "address[] [them] on a case-by-case basis . . . given the State- and fact-specific nature of these issues." *Id.* Adopting the same case-by-case approach that EEOC has used for decades under Title VII and the ADA was perfectly reasonable, *see id.* at 29,144-54; *see also Bell Aerospace Co.*,416 U.S. at 294, particularly where no State, including Plaintiff States, has identified an actually conflicting state law.[16]

---

[16] To the extent the States are disputing EEOC's determinations made pursuant to Executive Order No. 13132, *see* 89 Fed. Reg. at 29,182 (EEOC "reviewed this rule in accordance with Executive Order 13132"), that Executive Order is not privately enforceable. *See California v. EPA*, 72 F.4th 308, 317-18 (D.C. Cir. 2023); *Valentine Props. Assocs., LP v. U.S. Dep't of Hous. & Urb. Dev.*, 785 F. Supp. 2d 357, 368 (S.D.N.Y. 2011), *aff'd*, 501 F. App'x 16 (2d Cir. 2012).

### D.    The Final Rule Does Not Violate Article II and Separation of Powers

The Plaintiff States allege that EEOC's structure violates Article II and Separation of Powers considerations because, as they claim, the President may remove EEOC Commissioners only for cause. *See* Sts. Br. at 29-30. Even accepting their framing of this issue and EEOC's status, however, this argument is foreclosed by binding precedent, as the States themselves concede. *See id.*; La. Compl. ¶ 77 n.19. Both the Supreme Court and the Fifth Circuit have repeatedly recognized the permissibility of for-cause removal protections for multimember agency heads.[17] *See, e.g.*, *Humphrey's Ex'r v. United States*, 295 U.S. 602, 620, 626 (1935); *Free Enterprise Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483, 503 (2010); *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 204 (2020); *Consumers' Rsch.*, 91 F.4th at 342; *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1047 (5th Cir. 2023). And *Consumers' Research* specifically rejected the exact argument the States posit here—that *Humphrey's Executor* applies only to multimember bodies who do "not . . . exercise any executive power," Sts. Br. at 29; *see Consumers' Rsch.*, 91 F.4th at 354 ("exercis[ing] substantial executive power" does not remove an agency from *Humphrey's* exception). The Supreme Court has now denied certiorari in *Consumers Research*. *See* --- S. Ct. ---, 2024 WL 4529808 (Oct. 21, 2024). This claim is thus unfounded, whether framed as a merits issue or in terms of constitutional avoidance. *See* Sts. Br. at 29 n.13. Finally, even if there were some basis for the claim, the States make no effort to argue that "anything about the rule or its implementation would be different if the Commission had a different structure." 89 Fed. Reg. at 29,114.

---

The States, in a footnote, also claim that the Economic Analysis is flawed. *See* Sts. Br. at 28 n.12. Even if that claim were properly presented, *but see Harper v. Lumpkin*, 64 F.4th 684, 691 (5th Cir. 2023) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived[.]"), it would fail. The Economic Analysis was generated pursuant to executive orders that are not privately enforceable. *See* 89 Fed. Reg. at 29,155; E.O. 12,866 § 10; E.O. 13,563 § 7(d); E.O. 14,094 § 4(c). And, contrary to Plaintiffs' contention, it recognized that there may be some costs to States but reasonably determined that, the "additional costs" would be "minimal." 89 Fed. Reg. at 29,169 (discussing "substantially similar" state laws); *see id.* at 29,160 ("employers covered by the PWFA already are covered by Title VII and the ADA" and "will be able to use many of their existing procedures" and "human resources staff").

[17] EEOC is "composed of five members, not more than three of whom shall be members of the same political party. Members of the Commission shall be appointed by the President by and with the advice and consent of the Senate for a term of five years." 42 U.S.C. § 2000e-4(a).

## IV.    THE BISHOPS ARE NOT ENTITLED TO A PREENFORCEMENT BLANKET RFRA EXCEPTION

The Bishops' RFRA claim incorrectly portrays the Final Rule as requiring them to violate their religious beliefs, and EEOC as having already predicted that defenses under RFRA would fail. *See, e.g.*, USCCB Br. at 5, 27-28. Not so. EEOC recognizes that, in the context of individual cases, the Bishops may have a RFRA defense: the Final Rule does not require accommodations in all circumstances (such as when the accommodation is unreasonable, causes undue hardship, or would implicate religious exceptions), does not purport to resolve any RFRA defenses, and commits to taking such defenses seriously when evaluating them on a fact-specific basis. *See* 89 Fed. Reg. at 29,149. Additionally, EEOC's enhanced procedures allow for expedited review of defenses, including religious ones. *Id.* at 29,147-48. The Bishops have not credibly articulated any reason why EEOC's case-by-case adjudication of RFRA defenses itself violates RFRA.

### A.    The Final Rule's Case-by-Case Approach for Evaluating RFRA Defenses Is Not a Substantial Burden

The Final Rule applies across the country's employers, to a variety of entities, and makes clear it is not deciding or pre-judging any RFRA claims. *Id.* at 29,148-49 ("[T]he Commission will carefully consider these matters, analyzing RFRA defenses . . . on a case-by-case basis."). The Final Rule's commitment to addressing religious objections on a case-by-case basis is wholly consistent with RFRA and does not infringe on the Bishops' religious freedoms. *See, e.g., Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006) ("*O Centro*") (affirming "feasibility of case-by-case consideration of religious exemptions to generally applicable rules").

Such an approach renders this case fundamentally dissimilar to cases—including those cited by the Bishops—in which the courts concluded that a challenged agency policy *actually required* plaintiffs to do something that violated their religious beliefs. *See, e.g., Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720 (2014) (challenging *requirement* that closely held corporations provide insurance coverage for birth control); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 667-68 (2020) (challenging self-certification *requirement* for religious organizations); *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 929 (5th Cir. 2023) (noting "admissions from the EEOC

31

that Braidwood's current practices violate Title VII"); *Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361, 376 (N.D. Tex. 2021) (stating "[n]o party dispute[d]" that the relevant regulatory scheme was likely "to burden . . . [p]laintiffs' religious exercise"). Here, in contrast, the Bishops have not been "forc[ed]" to "choose between two untenable alternatives: either (1) violate [the law] and obey their convictions, or (2) obey [the law] and violate their convictions." PI Order at 16 (quoting *Braidwood*, 70 F.4th at 937). EEOC does not claim that the Bishops' policies facially violate the PWFA, given the availability of religious and other exceptions. And the Final Rule does not *per se* require the Bishops (or any employer) to grant accommodations as to which they have religious objections (or that pose undue hardships).

The Bishops now acknowledge that the Final Rule does not actually compel them to take any actions inconsistent with their religious beliefs, and instead commits to evaluating RFRA (and other defenses) "consistent with the facts presented and applicable law." 89 Fed. Reg. at 29,147. Given this commitment to consider RFRA defenses, the Bishops now argue that mere "potential liability" under the Final Rule is sufficient to constitute a substantial burden on their religious exercise. USCCB Br. at 28. But the Fifth Circuit has made clear that "[t]o demonstrate a substantial burden, the plaintiff must show that the challenged action truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." *Brown v. Collier*, 929 F.3d 218, 229 (5th Cir. 2019) (internal quotations omitted). And here, the factual record makes plain that the Bishop Plaintiffs are *not* pressured to change their behavior—they are firm in their refusal to provide accommodations to which they object. *See* 3d Ridderhoff Decl. ¶ 31 ("Because of these religious commitments, USCCB does not and will not provide any workplace accommodation for an employee to obtain a direct abortion."); *see also, e.g.*, 2d Brown Decl. ¶¶ 25-28, 30; 3d Caraway Decl. ¶ 11; 2d Fontenot Decl. ¶¶ 8-11. Indeed, they appear to have refused to provide any abortion-related benefits or accommodations over the past four decades, notwithstanding their understanding that EEOC viewed them as compelled by Title VII. *See Nat'l Conf. of Cath. Bishops*, 653 F.2d at 538-40. Nothing in the record supports the assertion that the Bishops would actually feel pressured to comply with the Final Rule absent judicial relief, which precludes a finding of "substantial burden" given that the Final Rule itself does not definitely require the Bishops to comply. *See supra* § I.

This case is therefore fundamentally dissimilar from *Franciscan Alliance, Inc. v. Becerra*, in which the Fifth Circuit concluded that plaintiffs' claims could proceed notwithstanding the agency's "promise to comply with the Religious Freedom Restoration Act[.]" 47 F.4th 368, 377 (5th Cir. 2022). That case involved five years of "Plaintiffs repeatedly challeng[ing] th[e] same RFRA violation" despite shifting agency positions, *Franciscan All.*, 553 F. Supp. 3d at 378, all of which "combined to threaten Franciscan Alliance in the same way that the challenged portions of the 2016 Rule did." *Franciscan All.*, 47 F.4th at 376. But here, EEOC has not simply "promised" to comply with RFRA; it has articulated its legal analysis in detail, *see* 89 Fed. Reg. at 29,148-50, and Plaintiffs point to nothing in that analysis that is defective. Moreover, EEOC has specifically enhanced its procedures for considering religious defenses—*i.e.*, allowing employers to raise religious (or other) defenses at any stage of the process, request prioritization of such defenses, and "easily inform [EEOC] of a potential defense" via an online portal, and providing that EEOC will then seek to "resolve the charge based on the information submitted in support of asserted defenses, including religious defenses, in order to minimize the burden on the employer and the charging party." *Id.* at 29,147-48.[18] And ultimately, EEOC's charge process is a non-adversarial, administrative proceeding that cannot itself result in any penalties for an employer, which further underscores that EEOC investigations do not themselves pressure the Bishop Plaintiffs to modify their behavior—as the record here confirms.

## B.    The Court Should Not Grant the Bishops a Blanket RFRA Exemption

Even if the Court concludes that the Final Rule's case-by-case approach to RFRA itself constitutes a substantial burden on the Bishop Plaintiffs, that still does not entitle them to the expansive relief they seek—*i.e.*, a preemptive declaration that they will always prevail under RFRA. *See, e.g.*, USCCB Compl., Prayer for Relief, ¶ d. Depending on the specific facts of a situation, the

---

[18] *EEOC v. Catholic University*, 83 F.3d 455, 466 (D.C. Cir. 1996), highlighted in the Court's PI Order, *see also* USCCB Br. at 28, is not to the contrary. While that case did involve a more protracted charge process and litigation, the conduct at issue in that case pre-dated both RFRA's enactment and EEOC's adoption of enhanced procedures, and the employer there failed to raise a RFRA defense until the case reached the D.C. Circuit. *See Catholic Univ.*, 83 F.3d at 468. That factual situation is fundamentally dissimilar to one the Bishops claim they might confront, where RFRA and other defenses can be raised at the Bishops' earliest convenience. Moreover, the underlying conduct at issue in the charge has nothing to do with the issues in this case.

RFRA analysis may well come out in the Government's favor—which precludes the broad relief they seek.

First, the Bishops do not demonstrate that their religious exercise would be substantially burdened by granting accommodations for abortions in all circumstances. For example, they do not oppose what they call "indirect" abortions, *see* USCCB Compl. ¶ 5; *see also* Tr. of Oral Arg. 6/12/2024 at 85:3-7 ("if a procedure is necessary to protect the life of the woman, that's not a direct abortion in the view of the Bishops [plaintiffs]"), and object only to "*knowingly* accommodat[ing]" the abortions they oppose, Kunkel Decl. (*USCCB*, ECF No. 11-5) ¶¶ 42, 37-38 (emphasis added); USCCB Br. at 5-6, 28.[19] To the extent the Bishops do not know that an employee is seeking an accommodation for care to which they object, that would not appear to constitute a substantial burden on their religious exercise.

Second, particular factual circumstances could involve compelling governmental interests. As this Court recognized in its PI Order, *contra* USCCB Br. at 29, the Government presents important interests and equities, including "eliminat[ing] discrimination and promot[ing] women's health and economic security." PI Order at 30 (quoting H.R. Rep. No. 117-27, at 1 (EEOC_136661). The Government's compelling interests also include ensuring that qualified employees can remain in the workforce while receiving health care, which may be needed for health- or life-saving reasons. *See* 89 Fed. Reg. at 29,103-04 n.57; *cf. Sierra Club v. City of San Antonio*, 115 F.3d 311, 315 (5th Cir. 1997).

Similarly, Congress also sought to "promote the economic well-being of working mothers and their families" by mitigating the "severe economic consequences" that can result from a refusal to provide a reasonable accommodation. H.R. Rep. No. 117-27, at 5, 25 (EEOC_136665, EEOC_136685). One can easily imagine factual situations where termination of an employee simply because they need a reasonable accommodation—such as time off related to an abortion or other care

---

[19] Although the Bishop Plaintiffs request relief related to "policies or practices regarding abortion, contraception, sterilization, and/or artificial reproductive technologies such as in vitro fertilization, artificial insemination, and surrogacy," USCCB Mot ¶ 6, the Bishops' only arguments under RFRA pertain to abortion. *E.g.*, USCCB Br. at 29, 31. They have therefore waived any RFRA arguments as to other topics.

to which the Bishops object—causes that employee, and their family, to experience economic distress—which again could constitute a compelling interest in application of the Final Rule in that particular scenario. The compelling interest in preventing women from being "forced to choose between their financial security and a healthy pregnancy," *id.* at 5 (EEOC_13665), is similarly furthered by protecting employees who require fertility treatments or surrogacy to safely reproduce. All of these interests are more specific than the kind of "[g]eneral statements" to which the Bishops refer, USCCB Br. at 29, and demonstrate that the Bishops are not entitled to a blanket RFRA exemption because, in at least some cases, there could very well be compelling governmental interests at stake.[20]

The Bishops' contention that EEOC always lacks a compelling interest in light of the exemptions available in the Final Rule is similarly unfounded. *See* USCCB Br. at 30. All of the neutral exemptions described in the PWFA and Final Rule, such as undue hardship[21] and exemptions of small employers—a common feature of civil rights statutes[22]—apply at least equally to religious

---

[20] Defendants dispute the Bishops' characterization of Defendants' compelling interests as "general statements." However, to the extent the Court finds the interests described above to be "general," and overbroad, this is in part because the Government's compelling interests are best assessed in the context of a specific case, with specific facts. *See, e.g., Holt v. Hobbs*, 574 U.S. 352, 362-63 (2015) (describing RFRA as contemplating a "more focused inquiry" (cleaned up)); *O Centro*, 546 U.S. at 430-31 (requiring "scrutin[y of] the asserted harm of granting specific exemptions to particular religious claimants"); *supra* § I.D. For example, where an employee needs an accommodation in order to obtain life-saving medical care, or when an employee is seeking care after being the victim of gender-based violence, such as rape, those compelling interests would need to be considered, along with the other governmental interests laid out above.

[21] Consideration of undue hardship includes hardships related to burdens on religion. *See, e.g.,* 89 Fed. Reg. at 29,154 (the Agency's consideration of assertions of undue hardship includes "whether granting a particular reasonable accommodation would 'fundamentally alter the nature of the business'").

[22] *See, e.g.,* 42 U.S.C. § 2000e(b) (Title VII applicable to employers with fifteen or more employees); 29 U.S.C. § 2611(4)(A)(i) (FMLA applicable to employers with 50 or more employees); 29 U.S.C. § 630(b) (ADEA applicable to employers with 20 or more employees); 42 U.S.C. § 12111(5)(A) (ADA applicable to employers with 15 or more employees). Congress's decision to limit the PWFA's application to small employers to promote one weighty interest—*i.e.,* "easing entry into the market and preserving the competitive position of smaller firms," *Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440, 447 (2003)—does not undermine the compelling nature of the interest that Congress sought to advance with respect to the class of covered employers. Otherwise, even Title VII's goal of combatting discrimination could not be considered compelling given that statute's small-employer limitation. *Contra EEOC v. Miss. Coll.*, 626 F.2d 477, 488-89 (5th Cir. 1980). And the Social Security Act likewise could not serve a "very high" governmental interest given the way its coverage was "broadened" over the years. *United States v. Lee*, 455 U.S. 252, 258-59 & n.7 (1982).

organizations. 89 Fed. Reg. at 29,151.

Finally, the Final Rule uses the least restrictive means to address these compelling interests and fulfill the PWFA's statutory mandates. Indeed, given the nature of the PWFA framework it is not clear what any alternative approach in the Final Rule could look like. Accommodations, like unpaid leave from work, can only be extended by employers, so EEOC "lacks other means of achieving its desired goal." *Hobby Lobby*, 573 U.S. at 728. The Bishops also ignore that "[t]he PWFA does not provide a mechanism for the Commission to provide legally binding responses to employer inquiries about the potential applicability of religious or other defenses" before a charge is brought. 89 Fed. Reg. at 29,147. And the Final Rule is narrowly tailored in preserving religious defenses and enhancing procedures for considering them, excepting accommodations that cause undue hardship, and specifying that employers (and their health plans) need not pay for any specific care or provide paid leave to employees seeking it. *See id.* at 29,104; 29,148; 42 U.S.C. 2000gg–5(a)(2). Within this particular statutory framework, Plaintiffs cannot demonstrate that they are entitled to a blanket RFRA exemption, and the Final Rule's case-by-case approach of considering RFRA defenses does not itself violate RFRA.

## V.     THE BISHOPS' OTHER CLAIMS ALSO FAIL

The Bishops also bring various other claims pertaining to religion and First Amendment rights. As discussed previously, there is likely no need for this Court to address these claims. *See* Defs' Br. at 34-35, 38-42. Regardless, each claim fails on the merits.

### A.     The Bishops' Free Exercise Claim Fails with Their RFRA Claim

The Bishop Plaintiffs bring a Free Exercise claim, arguing that the Final Rule is subject to strict scrutiny. *See* USCCB Br. at 31-32. But the Final Rule is "a neutral law of general applicability," 89 Fed. Reg. at 29,151, and neither the PWFA nor the Final Rule treats "comparable secular activity more favorably than religious exercise," *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). All of the Final Rule's neutral exemptions apply at least equally to religious organizations, *see supra* § IV.B; *supra* n.22, and are not the type of individualized, discretionary exemptions that could prompt strict scrutiny.

36

This case is therefore nothing like *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021). There, the Supreme Court found that a city policy burdened a contractor's religious exercise under strict scrutiny because it was not "neutral and generally applicable" where exceptions could only be granted at the commissioner's "sole discretion," which the commissioner "refuse[d] to extend . . . to cases of religious hardship." *Id.* at 533, 535 (cleaned up). But as explained, here, the Final Rule is "neutral and generally applicable," *id.* at 533, because its exceptions for small employers and undue hardship apply just as readily to religious entities, who are additionally entitled to RFRA and other constitutional exceptions. *See e.g.*, 89 Fed. Reg. at 29,151, 29,154; *cf. Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc) (emphasizing that the government may not "treat . . . *comparable* secular activity more favorably than religious exercise" (emphasis added)); *U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 833-34 (N.D. Tex. 2022) (finding government treated secular exceptions more favorably where it had in practice "granted *only* secular exemptions" and religious exemptions offered "less favorable" protections than secular ones). And far from indicating that it would "refuse to extend . . . exemptions . . . to cases of religious hardship," *Fulton*, 593 U.S. at 535 (cleaned up), the Final Rule is clear that religious defenses are available and EEOC takes "great care in situations involving . . . the rights of employers under the First Amendment[.]" 89 Fed. Reg. 29,149. In any event, even if strict scrutiny applied, Plaintiffs are not entitled to a categorical exemption for all the reasons discussed above.[23]

## B. The Final Rule Lawfully Interprets the PWFA's Rule of Construction Pertaining to Religious Employers

The Bishops also challenge the Final Rule's interpretation of the PWFA's Rule of Construction, which references Title VII's religious employer exception (42 U.S.C. § 2000e-1(a)). The relevant portion of Title VII, § 702, provides that "[Title VII] shall not apply . . . to a religious corporation, association, educational institution, or society with respect to the employment of

---

[23] As the Bishops acknowledge, their argument that the Free Exercise Clause requires strict scrutiny whenever government "imposes a substantial burden on religious exercise" is barred by *Employment Division v. Smith*, 494 U.S. 872, 879 (1990). Defendants further dispute whether the Final Rule imposes a substantial burden on the Bishops' religious exercise. *See supra* § IV.A.

individuals of a particular religion to perform work connected with the carrying on by such [entity] of its activities." 42 U.S.C. § 2000e-1(a); *see* 42 U.S.C. § 2000gg-5(b) (providing the PWFA "is subject to the applicability to religious employment set forth in section 2000e-1(a) of this title"). As a threshold matter, to the extent the Court grants the Bishops relief under RFRA, there is no need to consider this additional claim, which requests the same (or lesser) relief.  But if the Court does reach this claim, it should be found meritless.

The Bishops misapprehend the nature of the religious employer exception, and what the Final Rule says about § 107(b). While the Bishops argue that the Final Rule interprets the exception to "protect[] religious entities from claims of religious discrimination only," USCCB Br. at 19, the Final Rule says no such thing. Instead, as the Final Rule makes clear, entities are free to invoke religion as a defense to *any* claim of discrimination under the PWFA:

> If a qualifying religious organization asserts as a defense to a claim under the PWFA that it took the challenged action on the basis of religion and that section 107(b) should apply, the merits of any such asserted defense will therefore be determined on a case-by-case basis consistent with the facts presented and applicable law.

89 Fed. Reg. at 29,147. This case-by-case approach is the same one used by EEOC in considering Title VII's religious employer provision, which Plaintiffs have operated under for decades without any apparent problem. *See id.* at 29,146-47.

The Bishops now contend that the PWFA's Rule of Construction "applies categorically, without necessarily requiring case-by-case adjudication," and exempts religious entities from *any* PWFA claim if the employment decision was based on the employer's "religious belief, observance, or practice." USCCB Br. at 17-18.[24] But there is good reason to doubt the Bishops' interpretation, including under Fifth Circuit precedent. *See Miss. Coll.*, 626 F.2d at 484-86 & n.10 (explaining that even if § 702(a) allows an employer to "recruit only among Baptist colleges" for religious reasons, it may not "recruit only among Baptist Colleges that are predominantly white as opposed to all Baptist

---

[24] Although the Bishops may invoke the APA's cause of action to challenge EEOC's Final Rule implementing the PWFA, they cannot seek APA relief against any EEOC interpretation of Title VII, because there is no final agency action for such a challenge.

colleges"); *McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972); *see also* 89 Fed. Reg. at 29,147 n.239 (collecting cases). As the Fourth Circuit recently recognized, "[n]o federal appellate court in the country has embraced the . . . argument that Title VII permits religiously motivated sex discrimination by religious organizations." *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 328 (4th Cir. 2024). Even Plaintiffs' cited authority recognizes that several courts have rejected their interpretation of Title VII's religious employer exception. *See, e.g.*, *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 946 (7th Cir. 2022) (Easterbrook, J., concurring). Nor does *Curay-Cramer v. Ursuline Academy*, 450 F.3d 130, 132 (3d Cir. 2006), embrace the Bishops' position. *See* USCCB Br. at 18. To the contrary, the Third Circuit noted that "many claims of discrimination against a religious employer under Title VII will not raise serious constitutional questions." *Curay-Cramer*, 450 F.3d at 139.[25]

Ultimately, the question here is whether it was unlawful for the Final Rule to adopt a case-by-case approach for evaluating the Rule of Construction, and Plaintiffs provide no reason why case-by-case consideration of the § 107(b) defense is inappropriate even if their interpretation, discussed above, were correct. *See Bell Aerospace Co.*, 416 U.S. at 294. In particular, a case-by-case evaluation will *always* be required to determine whether an entity is a religious employer and whether its actions genuinely were taken on the basis of religion. *E.g.*, *Miss. College*, 626 F.2d at 484-86 & nn.10-11 (remanding for factual finding about whether hiring decision was based on religion or based on impermissible characteristic); *see also Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000) (applicability of exception is "primarily a factual battle"); *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring) ("[S]ex discrimination unrelated to religious doctrine falls outside the scope of § 702(a)."). And it is certainly not unlawful for EEOC to adopt a case-by-case approach in a rule with nationwide effect, rather than to adopt a categorical legal position that no federal appellate court has endorsed and several have

---

[25] With regard to the specific facts presented in *Curay-Cramer*, the court was weighing claims of comparative treatment of men and women by the employer in situations it found not "truly comparable." 450 F.3d at 140-41. The Third Circuit went on to note that the case before them was "distinguish[ed] . . . from [a case] in which a plaintiff avers that truly comparable employees were treated differently following substantially similar conduct," suggesting that some claims of sex discrimination by religious employers could be considered by the court. *Id.* at 141. The comparative questions at the heart of *Curay-Cramer* are not at issue in the cases before this Court.

rejected.

Nor does the "alien exemption" to Title VII compel a categorical approach to the PWFA's Rule of Construction. *See* USCCB Br. at 19. Title VII provides that the subchapter "shall not apply to an employer with respect to the employment of aliens outside any State." 42 U.S.C. § 2000e-1(a). In contrast, the religious employer exemption applies to "the employment of individuals of a particular religion to perform work connected with" a religious employer's activities. *Id.* The "alien exemption" is facially not limited to a particular type of employment in the same way, but rather recognizes that federal law generally is meant to apply only within the territorial jurisdiction of the United States. *See, e.g.*, *EEOC v. Aramco*, 499 U.S. 244, 248 (1991), *abrogated on other grounds by Arbaugh v. Y&H Corp.*, 546 U.S. 500, 511 (2006); *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 420 (D.C. Cir. 2005), *cert. denied* 546 U.S. 1173 (2006). At most, this issue only further highlights the appropriateness of the case-by-case approach, which allows EEOC and courts to continue to evaluate the proper scope of the Rule of Construction as they usually do—in the context of specific cases with concrete facts, rather than through abstract legal disputes.

Finally, Plaintiffs' invocation of constitutional avoidance is meritless. *See* USCCB Br. at 20. The Fifth Circuit has already confirmed that Title VII's religious employer exception may be applied consistent with the First Amendment. *Miss. Coll.*, 626 F.2d at 486-89.[26] And as discussed, some degree of inquiry is inherent to the exception, given the need to determine whether an employer is a religious employer and whether the objection is a religious one. EEOC's case-by-case approach does not require unconstitutional entanglement in internal religious affairs; to the contrary, it allows EEOC to ensure that it does not improperly wade into such matters unless necessitated by an actual charge.

Thus, the Final Rule lawfully implements § 107(b), and EEOC's case-by-case approach for evaluating these issues does not inherently raise constitutional concerns.

---

[26] Indeed, a number of cases cited by Plaintiffs, *see* USCCB Br. at 21, undermine their arguments. *E.g.*, *Little v. Wuerl*, 929 F.2d 944, 947-48 (3d Cir. 1991) (acknowledging that "Title VII has been interpreted to bar race and sex discrimination by religious organizations towards their non-minister employees"); *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 624 (6th Cir. 2000) (resolving only a claim of religious discrimination under the religious-employer exemption).

C.      **The Final Rule Does Not Violate the Church Autonomy Doctrine**

The Bishop Plaintiffs' theories of harm with regard to the church autonomy doctrine are unsupported by the Final Rule and relevant case law. While the Supreme Court has recognized "[t]he independence of religious institutions in matters of 'faith and doctrine,'" as well as "internal management decisions that are essential to the institution's central mission," that "does not mean that religious institutions enjoy a general immunity from secular laws[.]" *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020); *see also, e.g.*, *Starkman v. Evans*, 198 F.3d 173, 177 (5th Cir. 1999) (stating that "religious institutions are generally bound by the ADA and other employment discrimination laws," and thus "a church secretary or janitor may advance an ADA claim if he or she is discharged because of a disability"); *Miss. Coll.*, 626 F.2d at 487 (rejecting First Amendment defense raised by religious institution when "in the factual context before us, the application of Title VII to the College could have only a minimal impact upon the College's religion based practices"); *cf. McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 966 F.3d 346, 348 (5th Cir. 2020) (foreclosing judicial review only over "claims that require resolution of 'strictly and purely ecclesiastical' questions"); *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 657 (10th Cir. 2002) ("The church autonomy doctrine is not without limits, however, and does not apply to purely secular decisions, even when made by churches."). The Bishops point to no authority supporting their contention that an employer covered by the church autonomy doctrine is *per se* exempt from regulation of "ordinary workplace policies or practices," USCCB Br. at 24.

Moreover, the record does not demonstrate that the Final Rule will ever be applied to the Bishops in violation of church autonomy. Indeed, the Final Rule *confirms* that religious entities are subject to protections, and that EEOC "will 'take great care' in evaluating the asserted religious or other defense(s)" raised by employers, 89 Fed. Reg. at 29,147, including "consider[ing] the Establishment Clause implications as part of its case-by-case analysis," *id.* at 29,151. *Contra* USCCB Br. at 22 (claiming Final Rule forces them to violate their faith). Indeed, these defenses include the ministerial exception, which the Bishops do not challenge at summary judgment, and which protects similar interests as those covered by the church autonomy doctrine.

Nor does the Final Rule enable EEOC to engage in "ongoing, pervasive . . . surveillance" of the Bishops' activities or involve itself in "nearly everything that goes on" within Plaintiffs' workplaces. USCCB Br. at 25. EEOC's involvement can only be triggered by a charge, *see* 89 Fed. Reg. at 29,147, which may never even be filed and for which the Bishop Plaintiff could proffer religious defenses. *See supra* §§ I.A., II. EEOC's enhanced procedures for consideration of religious defenses as a threshold matter, *see* 89 Fed. Reg. at 29,147-48, will also prevent any unnecessary "entangling investigations," USCCB Br. at 22. *See also supra* n.18 (explaining why *Catholic University*, 83 F.3d at 455, is not illustrative of PWFA charge process). Finally, the Bishops are additionally mistaken that the EEOC is "require[d]" to "weigh the Church's religious beliefs and its mission to determine if a requested accommodation imposes an 'undue hardship.'" USCCB Br. at 26. Nothing about that defense requires EEOC's evaluating or "weigh[ing]," *id.*, of religious beliefs in the way the Bishops assert; instead, EEOC would simply evaluate the religious entity's explanation as to why granting the requested accommodation would pose an undue hardship. That is no more problematic than when courts evaluate whether a religious practice is substantially burdened under RFRA. And certainly this additional defense (available to both secular and religious employers) does not suggest any intent to "coerce religious employers," *id.*, particularly given the Final Rule's extensive discussion of the other defenses available to religious employers.

For all the reasons discussed above, the Bishop Plaintiffs cannot demonstrate their entitlement to a categorical exemption from the Final Rule's requirements based on the church autonomy doctrine. *Cf. EEOC v. Sw. Baptist Theological Seminary*, 651 F.2d 277, 287 (5th Cir. 1981) ("Neither the Supreme Court nor this court has held that the employment relationship between a church and all of its employees is a matter of purely ecclesiastical concern."). Instead, the church autonomy defense would necessarily need to be addressed on a fact- and case-specific basis, which is precisely the approach the Final Rule adopts.

### D.    The Final Rule Does Not Violate the Free Speech Clause

The Bishop Plaintiffs allege the Final Rule violates the Free Speech Clause by (1) compelling the Bishops to associate with employees whose conduct and speech undermines Plaintiffs' religious

expression and (2) restricting their religious speech and requiring facilitation of messages of which they disapprove. USCCB Br. at 33. But neither conclusion is supported.

**1.** As to expressive association, the Final Rule expressly allows employers to raise such defenses: "[S]hould the responding employer raise constitutional expressive association concerns as a defense to the charge during the charge process, the Commission will evaluate each claim on a case-by-case basis[.]" 89 Fed. Reg. at 29,153. The Bishops do not identify anything unlawful or irrational about the Final Rule's application of a case-by-case approach.

Indeed, the Bishops wholly ignore that the Supreme Court has previously held that employment discrimination laws like Title VII do not violate employers' associational rights. *See Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (allowing Title VII claim against law firm and noting that "[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections"). The Bishops' preferred case, *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000), was brought on the basis of New Jersey's public accommodations law, a doctrine with a distinct and separate history, *id.* at 656-57, and did not overrule *Hishon*. Additionally, employers have the undisputed right under the religious employer exemption to prefer to employ individuals who share their religion, *see, e.g.*, 42 U.S.C. § 2000gg-5(b); *Little*, 929 F.2d at 951; EEOC, *Compliance Manual on Religious Discrimination*, (12-I)(C) (2021), *available at* https://perma.cc/GJ6R-BLZL, which further undermines the Bishops' claim that they are "compel[ed] . . . to associate with employees" with whom they disagree, USCCB Br. at 33.

**2.** The Bishops' free speech claim also fails. As discussed above, none of the Plaintiffs has demonstrated that they currently, or imminently intend to, engage in speech that would plausibly be "censor[ed]," USCCB Br. at 34, by the PWFA's anti-coercion and anti-retaliation provisions, which have existed in similar form under Title VII and the ADA for decades without any apparent First Amendment concerns. *See supra* § III.B. Indeed, the Final Rule makes plain that the type of speech described by the Bishops does not violate the PWFA. *See* 89 Fed. Reg. at 29,142 ("[T]he making of general statements regarding an employer's mission or religious beliefs is not the type of conduct that

the Commission previously has determined would be prohibited by this provision."); *see also* Blomberg Decl. (*USCCB*, ECF No. 77-2), Ex. 6 at 47-48 ("If a religious employee attempts to persuade another employee of the correctness of his beliefs, the conduct is *not necessarily objectively hostile*." (emphasis added)). Nor does the Final Rule require them to affirmatively "promote, or endorse" care to which they object. 89 Fed. Reg. at 29,111. And to the extent the Bishops' purported speech is really just their unwillingness to grant particular types of accommodations, that is conduct that can lawfully be regulated, not expressive speech protected by the First Amendment. *See FAIR*, 547 U.S. at 62.

Moreover, the Bishops' claim is founded on a false premise—that "the Final Rule includes no exception for protected speech." USSCB Compl. ¶ 265. To the contrary, the Final Rule is again explicit that EEOC will consider free speech defenses on a case-by-case basis: "[S]hould the Commission receive a charge alleging coercion or retaliation, and should the responding employer raise constitutional concerns as a defense to the charge during the administrative charge process, the Commission will evaluate each claim on a case-by-case basis[.]" 89 Fed. Reg. at 29,152. This approach is not unlawful or irrational, particularly given the absence of free speech concerns raised in connection with similar provisions in Title VII and the ADA. *See id.* Thus, the Final Rule does not burden the Bishops' First Amendment speech rights.

## VI.    THE COURT SHOULD NOT GRANT PLAINTIFFS' REQUESTED REMEDIES

Plaintiffs seek a variety of remedies: vacatur, an injunction, and declaratory relief. But it would be improper for this Court to grant every requested or potentially applicable form of relief. *E.g.*, *Texas v. EEOC*, 933 F.3d 433, 451 (5th Cir. 2019); *Roark v. S. Iron R-1 Sch. Dist.*, 573 F.3d 556, 562 (8th Cir. 2009) (vacating "superfluous" relief as abuse of discretion). While Defendants maintain that any remedy here would be inappropriate, any relief this Court nevertheless grants should be limited to declaratory or injunctive relief that is tailored to the parties and legal claims they have brought. Universal relief would be inappropriate and is not supported by the factual record; the named plaintiffs' injuries can be fully remedied through plaintiff-specific injunctive and/or declaratory relief.

### A.    Nationwide Relief, Including Vacatur, is Not Appropriate in This Case

Plaintiffs request vacatur as to the Final Rule's inclusion of abortion, and the Bishops further request vacatur of the Final Rule's construction of the PWFA and Title VII "religious exemptions." Sts. Br. at 30-31; USCCB Mot. at 3.[27] But vacatur or a universal injunction is inappropriate here, because this Court could provide complete relief for any alleged injuries through party-specific declaratory or injunctive relief.[28]

This Circuit's precedents have made clear that vacatur is not a *mandatory* remedy. *See, e.g.*, *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (plurality opinion) (concluding without contradiction from any member of the court that the district court could consider on remand "a more limited remedy" than universal vacatur, and instructing the district court to "determine what remedy . . . is appropriate to effectuate" the judgment), *aff'd*, 602 U.S. 406 (2024); *Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021); *see also* Final Order (ECF No. 103), *Gun Owners of Am., Inc. v. Garland*, No. 1:18-cv-01429 (W.D. Mich. Nov. 1, 2024) (declining to vacate rule Supreme Court found issued in excess of agency statutory authority and providing only declaratory relief). In light of traditional equitable principles generally restricting relief to the parties, this Court should decline to vacate the challenged portions of the Final Rule, as that would affect parties not before the Court—*i.e.*, countless employers and private individuals covered by the Final Rule, none of whom has any connection to this Court, the Plaintiffs here, or these Plaintiffs' claimed injuries. *See, e.g.*, *Gill v. Whitford*, 585 U.S. 48, 73 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."); *see also Texas*, 599 U.S. at 694 (Gorsuch, J., concurring in the judgment) ("[T]he 'judicial Power' [in U.S. Const. art. III, § 2] is the power to decide cases for parties, not questions for everyone." (cleaned up)); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (principles of equity prohibit remedies that are "more burdensome to the defendant than necessary to provide complete relief to the plaintiffs").

---

[27] No party seeks vacatur of the Final Rule in full.

[28] The federal government does not believe that the APA provides for vacatur, providing instead for more traditional equitable remedies like injunctions. *See* 5 U.S.C. § 703. However, the Fifth Circuit has held that vacatur is an available remedy for APA challenges. *E.g.*, *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859-60 (5th Cir. 2022).

Affording relief that would affect employers and individuals beyond those party to this case—whether through vacatur or other relief stretching beyond the parties—is particularly unwarranted in the present circumstances. First, such relief would intrude into the province of other federal judges to adjudicate the cases and controversies before them and deprive the judicial system of the benefits that accrue when different courts grapple with complex legal questions in a careful, considered dialogue. *See Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600-01 (2020) (Mem) (Gorsuch, J., concurring). The instant case starkly illustrates those problems, because at least four other lawsuits challenging the Final Rule have been filed in other jurisdictions,[29] and another Court has already rejected claims similar to the States' claims here, *see generally Tennessee*, 2024 WL 3012823. Granting nationwide relief in this case would perpetuate all of the well-catalogued problems with overbroad universal remedies. *See, e.g., Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 921-28 (2024) (Mem) (Gorsuch, J., concurring).

Moreover, providing relief beyond the parties as to the Final Rule or EEOC's administrative procedures would harm the interests of non-parties. Employers benefit from the certainty that the Final Rule provides. *See* Br. of *Amici Curiae* Small Bus. Maj., Main St. All. & Am. Sustainable Bus. Council in Opp'n to Pltfs' Mot. for Prelim. Inj., *USCCB*, ECF No. 43-1, at 2-3 (small business associations and members "better understand their obligations to their employees following the issuance of the Final Rule"; "[d]elaying enforcement of the Rule will sow chaos and confusion"); *USCCB*, June 13, 2024 Text Order, ECF No. 49 (granting filing of amicus brief). Additionally, enjoining the Final Rule and its administrative procedures could increase costs on both employers and employees, as well as the judiciary, by "forc[ing] into court matters that the EEOC might otherwise have resolved," and "preventing earlier resolution" of employees' charges, thereby "increas[ing] the burdens of both time and expense." *West v. Gibson*, 527 U.S. 212, 219 (1999). At a minimum, relief that

---

[29] *Dr. James Dobson Family Inst., et al. v. Becerra, et al.*, No. 4:24-cv-00986 (N.D. Tex. filed Oct. 15, 2024); *The Stanley M. Herzog Found. v. EEOC, et al.*, No. 4:24-cv-00651 (W.D. Mo. filed Oct. 4, 2024); *The Cath. Benefits Ass'n, et al. v. Burrows, et al.*, No. 1:24-cv-00142-DMT-CRH (D.N.D. filed July 24, 2024); *Tennessee*, No. 2:24-cv-0084-DPM (E.D. Ark. filed Apr. 25, 2024), *on appeal,* No. 24-02249 (8th Cir.).

applies to non-parties would confuse and delay private individuals' efforts to pursue their rights under the PWFA.[30]

**B.      Appropriately Tailored Injunctive and Declaratory Relief Fully Remedy Plaintiffs' Asserted Harms**

The States request that a permanent injunction have the same scope as the preliminary injunction, which did not apply nationwide, but did apply to nonparties to this case—*i.e.*, all employers with respect to employees whose primary duty station is in Louisiana or Mississippi. *See* Sts. Br. at 30-31; PI Order at 31. The Bishops request nationwide injunctive relief as to the inclusion of abortion in the Final Rule and in the PWFA, and injunctive relief as to any requirements in tension with their religious objections. *See* USCCB Mot. at 3. But any remedy must be no broader than necessary to remedy any demonstrated irreparable harms of the Plaintiffs in this case. *See Whitford*, 585 U.S. at 73; *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *supra* § IX.A. This is especially true because the PWFA and the Final Rule contain severability clauses. *See* 42 U.S.C. § 2000gg-6; 29 C.F.R. § 1636.8. These principles require that the Court limit relief in at least three respects.

First, as this Court determined at the preliminary injunction stage, and as Plaintiffs agree, any relief should only extend to the narrow portion of the rule the Court finds unlawful, if any. *See* PI Order at 32 (preliminarily enjoining Final Rule only as to "abortion that is not necessary to treat a medical condition related to pregnancy."); *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (relief should be "be limited to the inadequacy that produced the injury in fact"); *Sw. Elec. Power Co. v. U.S. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019) (vacating only portions of the final rule it found "unlawful"). With respect to the parties' APA claims in particular, then, this Court should continue to exclude from any relief "terminations of pregnancy or abortions stemming from the underlying treatment of a medical condition related to pregnancy," which "are clearly 'related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions.'" PI Order at 31 n.16 (quoting 42 U.S.C. § 2000gg(4)).

---

[30] Overbroad relief would also threaten to create a situation where this court is opining on PWFA claims that it would not otherwise have jurisdiction over. *See* 42 U.S.C. § 2000gg-2(a) (adopting procedures in 42 U.S.C. § 2000e-5, including § 2000e-5(f)(3), which require claims be brought in the federal district court in which the allegedly unlawful employment practice occurred).

Second, any relief should apply only to the Parties and only to their identified injuries. Such relief would fully remedy any "inadequacy that produced [Plaintiffs'] injury in fact." *Whitford*, 585 U.S. at 68. As the Supreme Court recently cautioned, a plaintiff generally has no cognizable Article III interest in interfering with an agency's regulation of third parties. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 374 (2024) (explaining that, "[u]nder Article III of the Constitution, a plaintiff's desire to make a drug less available *for others* does not establish standing to sue"). An injunction reaching beyond the parties would thus exceed the Court's equitable authority, as discussed in the preceding section.

Limiting relief to only the Parties necessarily includes that Plaintiff-States should only receive relief in their capacities as employers, rather than relief flowing to *all* PWFA-covered entities within those States. While the Court extended preliminary relief to covered entities "with respect to all employees whose primary duty station is located in Louisiana or Mississippi," PI Order at 31, Defendants respectfully maintain that such private, unknown individuals who are not before this Court are not the proper subject of any relief. *See, e.g.*, *Whitford*, 585 U.S. at 73; *Madsen*, 512 U.S. at 765; *cf. Valley Force Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) ("plaintiff . . . cannot rest his claim to relief on the legal rights or interests of third parties"). The States lack standing to seek relief on behalf of private individuals not before the Court. *See Haaland*, 599 U.S. at 294-95; *Murthy*, 144 S. Ct. at 1996-97. The States' declarations provide no evidence supporting relief extending to non-parties to this suit. *See generally* 2d Schober Decl.; 2d Keen-Schilling Decl.; 2d Hardwick Decl. Thus, the factual record confirms that an injunction limited to the Plaintiff States in their capacities as employers would remedy all of Plaintiffs' purported injuries.

The Bishop Plaintiffs also cannot seek relief on behalf of non-parties, and their declarations also do not support such relief. *See generally* 2d Kunkel Decl.; 3d Ridderhoff Decl.; 2d Brown Decl.; 3d Caraway Decl.; 2d Fontenot Decl. Any broader relief would also improperly impute the Bishops' beliefs to non-parties with different beliefs who have not sought relief against the Final Rule. *See, e.g.*, 42 U.S.C. § 2000bb-1(c) (the "*person whose religious exercise has been burdened* . . . may . . . obtain appropriate relief against a government" (emphasis added)); *O Centro*, 546 U.S. at 431 (requiring courts to examine

"the asserted harm of granting specific exemptions to particular religious claimants"); *Hobby Lobby*, 573 U.S. at 726 (RFRA contemplates a "more focused" inquiry and "requires the Government to demonstrate that the compelling interest test is satisfied through the application of the challenged law" to "the particular claimant whose sincere exercise of religion is being substantially burdened"). Additionally, the Bishop Plaintiffs object only to *knowingly* accommodating care to which they have religious objections. *See, e.g.*, USCCB Br. at 4-6, 22, 24, 28. Therefore, any relief on their religion-related claims should also be cabined to those situations. *See Whitford*, 585 U.S. at 68.

Third, any relief should not prohibit EEOC from complying with its statutory duty to issue notice of right to sue letters (NRTS) to employees, even if the agency is prohibited from investigating certain claims. *See* 42 U.S.C. § 2000e-5(b), (f)(1). As an initial matter, Plaintiffs' complaints nowhere challenge or seek relief against the specific provision of the PWFA requiring EEOC to issue NRTS, nor do Plaintiffs' summary judgment briefs make arguments regarding this form of relief. To the extent this Court's preliminary injunction, restraining issuance of NRTS, sought to hinder private parties' abilities to bring private suits against their employers, such aim would run counter to the Supreme Court's mandate that non-parties should not "be obliged to honor an incidental legal determination [that a] suit produced." *Murthy*, 144 S. Ct. at 1995 (quoting *Lujan*, 504 U.S. at 569); *see also Whitford*, 585 U.S. at 73; *Madsen*, 512 U.S. at 765. Enjoining NRTS also would not achieve that purpose. NRTS do not represent a determination that an employee's claim is meritorious and are issued as a matter of course in situations where EEOC has dismissed a charge or elected not to file suit against an employer. *See* 42 U.S.C. § 2000e-5(f)(1). Moreover, even with an injunction, employees would still be able to assert equitable bases for waiver of the NRTS requirement before bringing a claim against an employer. *See supra* n.2 (discussing non-jurisdictional nature of requirement). In fact, all parties would be worse off. Without the 90-day statutory limitations period for suit triggered by issuance of the NRTS, *see* 42 U.S.C §§ 2000e-5(f)(1), 2000gg–2; 29 C.F.R. § 1601.28, employers would suffer uncertainty about whether and when employees might sue and could be subject to litigation for claims that would have otherwise long expired. Employees would be similarly confused about their rights under the statute, which is particularly problematic where the statute in question is intended for

49

use by laypeople. *E.g.*, *Edelman v. Lynchburg College*, 535 U.S. 106, 115 (2002) (describing "Title VII's nature as a remedial scheme in which laypersons, rather than lawyers, are expected to know the process"). And both parties, and courts, would be furthered burdened by having to litigate the applicability of equitable exceptions. This Court should avoid triggering such administrative confusion and costs.

These limits describe the maximum relief theoretically available, but the proper approach would be to grant Defendants' motion, deny Plaintiffs' cross-motions, and dismiss the case entirely.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss, or, in the alternative, grant summary judgment in Defendants' favor, deny Plaintiffs' motions for summary judgement, and dismiss this case.

Dated: November 12, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

EMILY B. NESTLER
Assistant Branch Director

DANIEL SCHWEI
Special Counsel

*/s/ Laura B. Bakst*
LAURA B. BAKST (D.C. Bar #1782054)
ALEXANDRA WIDAS (D.C. Bar #1645372)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 514-3183
Facsimile: (202) 616-8470
Email: laura.b.bakst@usdoj.gov

*Counsel for Defendant*